STEPANIAN v. MOSKOVITZ.

1. VENDOR AND PURCHASER—PRIVITY OF CONTRACT—INSTRUCTIONS. STRUCTIONS.

In an action to recover earnest money paid on the purchase price of real property, which was never completed, where the writings in evidence failed to show privity of contract between the parties, the trial court properly instructed the jury that there was no privity of contract upon which recovery could be predicated.[1]

2. SAME—ORAL CONTRACT—QUESTION FOR JURY.

Whether defendant subsequently orally agreed to return said earnest money to plaintiff, as testified to by him, held, properly submitted to the jury.[2]

3. COURTS—JUDICATURE ACT—STATUTORY PROVISION REQUIRING DECISION WITHIN 60 DAYS OF SUBMISSION OF ISSUE TO COURT IS DIRECTORY MERELY.

The provision in the judicature act (3 Comp. Laws 1915, § 12585) that the decision of the trial court shall be given within 60 days from the time any issue or cause is submitted, is directory merely, and a delay beyond said period does not arbitrarily divest the court of jurisdiction, regardless of the reason or excuse therefor.[3]

Error to Wayne; Mayne (Frederick W.), J., presiding. Submitted April 7, 1925. (Docket No. 21.) Decided December 22, 1925.

Assumpsit by Koorken Stepanian against Harry A. Moskovitz for money had and received. Judgment for defendant. Plaintiff brings error. Affirmed.

*Younglove & Chockley*, for appellant.
*Rich, Brown & De Ferie*, for appellee.

STEERE, J. Plaintiff commenced this action in a

[1]Vendor and Purchaser, 39 Cyc. pp. 2054, 2068; [2]Id., 39 Cyc. p. 2069; [3]Courts, 15 C. J. § 297 (Anno).

justice court of Wayne county to recover $500 which he had paid as a binder or earnest money on the purchase of a property in Detroit called 35 Edmund Place, consisting of a lot 60x100 feet with a large rooming house upon it, the price to him being $41,500. Defendant Moskovitz claimed to own this property and to be able to give a good title to it. He contracted on May 12, 1920, to do so when full payment was made, and to furnish a Burton or Union Trust abstract brought down to date which would show a good, merchantable title within 10 days, when the next payment of $5,500 was to be made. But it so eventuated that the contract to that effect which he signed did not run to plaintiff. Neither did he own the property. The only interest he had in it was some sort of an option of doubtful value, the exact nature of which is not disclosed but which resulted in an injunction suit by the owner of the property and only figures here as his explanation of his failure to furnish an abstract as agreed and default on his part in performance of the contract.

His contract ran to a broker or agent named Acker whom plaintiff made a joint defendant when commencing his action in justice's court but subsequently dropped him from the case by filing an amended declaration against Moskovitz only. Plaintiff had judgment in that court for the $500 he had paid, with interest, from which defendant appealed to the circuit court where on retrial before a jury plaintiff again prevailed. A new trial was thereafter granted on defendant's motion and trial again had before a jury resulting in a verdict and judgment for defendant, and plaintiff brings the case to this court for review on numerous assignments of error.

The circuit judge before whom the case was first tried granted a new trial on the ground that there was

no privity of contract shown between plaintiff and defendant, saying in part:

"I am satisfied that, in this case, under the law, the plaintiff dealt with and trusted one J. D. Acker entirely in the transaction of the purchase of the land. Plaintiff paid $500 to J. D. Acker and accepted a receipt therefor. Mr. Acker signed the receipt personally. Plaintiff also knew that defendant, Moskovitz, owned the property and was present only but a short distance away when the plaintiff accepted the papers from the said Acker for the $500. Testimony showed that said J. D. Acker had a contract with defendant Moskovitz which was separate from the contract between the plaintiff and Acker."

On the second trial, now before us for review, the presiding judge was like minded as to the documentary evidence in the case and said to the jury, "On the face of these writings this was a deal between Mr. Acker and the plaintiff in this case," but submitted to the jury the question of defendant's admission of liability as follows:

"The question for you to determine then, in this case, is this: Did the plaintiff, at the time that he claims, go to the defendant and charge him with liability, legal liability for the return of the money; did he make him a tender of the amount and then and there did the defendant acknowledge to him his legal liability and promise to make payment upon the next day, if he would wait that long, practically, or did he not? If he did, I charge you as a matter of law that there was sufficient consideration and that that was a good contract, and that it can be enforced; and if you so find, you will bring in a verdict for the plaintiff against the defendant for the sum of five hundred dollars, plus the interest. If he did not make this agreement and promise to make the payment, if he denied liability, or if he never was interviewed, as he claims, by the plaintiff, charging liability, then there is no liability and your verdict would be no cause of action. * * * If you find the truth to be as claimed by the plaintiff, then your verdict as I said— as I say to you, will be in favor of the plaintiff in the

sum of $500 or, if it is for the defendant, for no cause of action."

The four parties who figured in this abortive deal were plaintiff Stepanian, defendant Moskovitz, Acker and a fellow-countryman of Stepanian named Gaydzak who testified he had been in the real estate business since 1918 and that Stepanian was his friend. The latter said he had known Gaydzak six or seven years and supposed he was his friend. Acker appears to have been the master mind in this transaction and the only one who profited by it. For some undisclosed reason neither party called him as a witness.

The parties litigant were men of business experience. Moskovitz said he was in the haberdashery business and in 1920 bought and sold considerable real estate. Stepanian testified that his business was dry goods and he was also then disposed to invest in some property. The two men were total strangers to each other until they met during this transaction through the agency and in the presence of Acker and Gaydzak. Gaydzak testified he knew Stepanian was wanting to buy some real estate and when he saw this property on Edmund Place advertised for sale under the name of John M. Welch & Son with whom he happened to know Acker was in some way connected he communicated with Acker and told him he had a prospect, proposing that they two work together in putting through the deal, which they proceeded to do.

Apparently next in sequence of events, Acker interviewed Moskovitz. We only have the latter's version of that interview. He testified that a man named Acker came along and telling him he knew he had that property for sale, asked what he would take for the place and turn it over to him right away, as he had a friend to whom he thought he could sell it; that after some talk Acker said "I am willing to give you $40,000 for it," to which Moskovitz said that

would be "all right," and agreed to take it; he never had any dealings with Stepanian, whom he subsequently met as a prospective purchaser from Acker, never agreed to sell him the property and no writings ever passed between them on the subject, his deal was directly with Acker who was not his agent and never represented him.

Having made a tentative deal with Moskovitz, Acker and Gaydzak proceeded to work in combination on Stepanian, who was favorably impressed and expressed a desire to see the place.    They took him up to see it in an auto but the woman in charge refused them admission and Acker told the others to wait there while he went for the owner.    He returned with Moskovitz, whom Stepanian then first met.    Moskovitz obtained admission and went through the house with them.    Gaydzak, whose powers of description, in English, excelled those of his friend Stepanian and was called as a witness for him, told how the combination was worked while the deal was on, and the result, in part, as follows:

"After we got through seeing the property we come down to the front room facing Edmund Place and sat there in the front window talking about the price. Mr. Moskovitz was asking $43,000, I believe, and Mr. Stepanian argued about the price being too high. And then Mr. Acker and myself and Mr. Moskovitz got into a corner, leaving Mr. Stepanian with the rest of the boys there, and talked the price over again, and Mr. Moskovitz agreed that he would take $41,000 for the place, provided for the completion of the commission we could get a little over $41,000.    So we come back to Mr. Stepanian and talked to him to agree to buy the place for $41,500 and we agreed about the price at the time, when another bell rang and those people came and Mr. Moskovitz went there and talked with the people.    Then he rushed in and said, 'Boys, if you want to buy the place, you got to hurry, otherwise these people are buyers.'    Then Mr. Stepanian said, 'Well, I will buy the place.'    Upon that Mr.

Moskovitz sent those people away again, and we said, 'We will go to the store, we will drive over there and make the papers and put up the deposit so that we will buy the property.'  *  *  *

"*Q.* Why didn't you tell your friend of six or eight years' standing that you could have bought this property for $40,000?

"*A.* My friend was buying the property through us and he knew that we had to make some commission for selling it; and it wasn't being sold to my friend, or not being sold by Moskovitz for $40,000, it was $43,000, in the first place.  I know that three per cent. is the Detroit real estate board commission. That commission would be about $1,300.

"*Q.* So that you and this man Acker went out and handled this proposition this way and instead of making $1,300 you made $1,500, didn't you?

"*A.* We made $1,500, yes.  *  *  *  I didn't see anything; not a penny from anybody.  As far as my commission is concerned, I don't know, if Acker has got the money he double-crossed me, of course; if he didn't get the money, I didn't get not a penny out of it."

After Stepanian said he would take the property they drove down in their autos to Moskovitz's haberdashery to close the deal.  They then all went inside to draw up the papers except Stepanian, whom they left outside sitting in an automobile.  Gaydzak first testified that Acker, Moskovitz and Moskovitz's son acted as conveyancers, which he later somewhat confused by relating various things that "we," did and telling of papers which he and Acker drew up for Stepanian.  Exhibit 1 of these papers is a check on a Highland Park bank for $500 payable to order of Acker and signed by Stepanian.  Gaydzak testified that Acker first offered his own check for the $500 earnest payment to Moskovitz which he declined.  He and Acker then drew up a check to Acker for Stepanian to sign and took it out to him where he was sitting in the automobile, and had him sign it.  They then went back and Acker indorsed and gave the

check to Moskovitz who accepted it as first payment on the memorandum agreement or preliminary contract between him and Acker for sale of the property to the latter for a consideration of $41,000, which he signed and delivered to him. He also signed and gave to Acker a separate receipt which they had prepared for the $500, briefly stating what it was for and concluding as follows:

"I agree to give possession June 1, 1920, or as soon after as I possibly can and to pay J. D. Acker a commission of one (thousand dollars) $1,000 as the broker in this transaction. It is agreed that this deal will be closed on or before ten days from date.
(Signed)    "H. A. MOSKOVITZ."

It does not appear that Stepanian then had any knowledge of those two papers, but it was shown by oral proof that Acker at that time signed and gave him a receipt for the $500 he obtained from him, briefly stating it was for the purchase of this property from him. Later in the day they drew up a preliminary contract between Acker and Stepanian following in substance that Moskovitz had given Acker, except that the purchase price was $41,500. This Acker signed and gave to Stepanian. When asked why they did not have Stepanian and Moskovitz get together and sign the same paper evidencing this deal, Gaydzak legally illuminated the situation as follows:

"As far as the real estate deal was concerned, through an agent, it didn't matter whether Stepanian signed a paper with Moskovitz to buy and sell, or Mr. Moskovitz signed a paper to sign that contract to an individual or not."

All four papers in evidence are dated May 12, 1920, and were made to and signed by the parties in their individual names. The only paper Stepanian signed was the check he gave to Acker and the only paper he received was signed by Acker, ac-

knowledging receipt of the $500 and agreeing conditionally to sell him the property. Both the memorandum of agreement from Moskovitz to Acker and from the latter to Stepanian contained the essential elements of a valid land contract and were binding on the vendor when accepted and complied with by the vendee. Previous oral agreements or understandings of the parties were merged in them. They are plain and unambiguous, and cannot be changed or modified to mean other than what they plainly say by any testimony as to previous talks or understandings of the parties. They are destitute of any privity of contract between plaintiff and defendant.

When the ten days' limit in which Moskovitz was to furnish the abstract and the next payment made drew towards a close, Stepanian was ready with his payment, and first went with his money and complaints of delay to Gaydzak and Acker. They exonerated themselves and took him to Moskovitz. He acknowledged he had not yet been able to get the abstract and expressed fears the deal would fall through, saying he would pay them back the $500 if he could not fulfil. This he repeated on different occasions when they importuned him on the subject. Plaintiff testified that he personally promised to pay him back the $500 if the deal fell through. This Moskovitz denied, claiming he never dealt with plaintiff but with Acker, who paid him the money. Acker in the meantime brought an action against him which was subsequently settled and discontinued on Moskovitz paying him back the $500. The court left the question of defendant's subsequent oral promise to pay plaintiff the $500 to the jury, and rightly instructed them that on the face of the writings in evidence there was no privity of contract between the parties upon which recovery could be predicated.

The further contention is made for plaintiff that the trial judge at the first trial of this case, which resulted in judgment for plaintiff, had no authority to set aside that judgment, and all subsequent proceedings were a nullity because the motion for a new trial was submitted March 24, 1922, and the opinion granting the same was not filed until February 26, 1923, or more than the 60 days' limit after its submission, as provided by the judicature act (3 Comp. Laws 1915, § 12585). To construe the provision in question as meaning that a delay of 60 days in deciding any question submitted in a pending case arbitrarily divests the court of jurisdiction, regardless of the reason or excuse therefor, or the nature of the case, would be a harsh and in many cases an unjust construction, tending to inflict disastrous consequences on parties in no manner responsible for the delay.

In *Rawson* v. *Parsons*, 6 Mich. 401, this court was called upon to construe a statute requiring decisions to be filed in cases heard by the court without a jury on or before "the first day of the term succeeding that in which the cause was submitted." In that case several succeeding terms had passed before the decision was filed. Speaking through Justice CHRISTIANCY, this court there said:

"We are all of opinion that this provision, as relates to the time within which the decision shall be given and filed, is directory merely. It imposes a duty upon the judge; but as the parties have no control over his action, it would be a harsh construction which should deprive them of the fruits of the litigation because the judge fails to decide by a particular day."

We find no occasion to depart from that precedent. The judgment will stand affirmed.

McDONALD, C. J., and CLARK, BIRD, SHARPE, MOORE, and FELLOWS, JJ., concurred.

WIEST, J. (*concurring*).    I concur.    I am of the opinion that the legislature has no power to fix the time within which judicial decisions shall be made. A spurring to prompt decision may be praiseworthy but spurs can only be applied by a rider and the legislature does not occupy the judicial saddle.    The statute expresses a commendable ideal and spends its whole force in the utterance thereof.    It does not punish litigants for delay excusable or inexcusable by the judge and does not and could not provide departure of judicial power from the judge.    It is a legislative intimation of a promptness most desirable, entitled to respect as such, but in no sense a mandate regulating rights and remedies.