EMERY v. FORD.

1. NEGLIGENCE—PERSONAL INJURIES—CONTRIBUTORY NEGLIGENCE.
   In an action for personal injuries alleged to have been caused by the negligence of an employee of defendant while driving an automobile, in which plaintiff was a passenger, the questions of the driver's negligence, plaintiff's contributory negligence, and the extent of the latter's injuries, *held*, on the record, issues of fact for the jury.[1]

2. SAME—PRINCIPAL AND AGENT—LIABILITY OF PRINCIPAL — EVIDENCE—SUFFICIENCY.
   In an action for personal injuries caused by an automobile accident, where the defendant denied liability for the driver's negligence, testimony *held*, sufficient from which the jury could legitimately find that the driver of the car was directed by one of defendant's agents to get the automobile and take plaintiff with him to the city for which they were bound when the injury to plaintiff was received.[2]

[1]Motor Vehicles, 28 Cyc. pp. 48, 49, 49 New; [2]Id., 28 Cyc. p. 47. On excessiveness of verdicts in action for damages other than death, see note in L. R. A. 1915F, 30.

**3. SAME — IMPLIED AUTHORITY FROM PRINCIPAL TO USE AUTOMOBILE.**

Testimony by defendant's agent, who had general charge of the work of collecting certain ballots all over the State, that transportation was not discussed or even thought of, *held*, to imply authority for those in charge of the details of said work to obtain such means of transportation as they thought best served the undertaking, including the use of automobiles.[3]

**4. PRINCIPAL AND AGENT — DELEGATION OF POWER CARRIES AUTHORITY TO DO REASONABLY NECESSARY ACTS — DOING FORBIDDEN ACTS — TORTS.**

In the law of agency it is a fundamental principle that every delegation of power carries with it authority to do all things which are reasonably necessary or proper to efficiently carry into effect the power conferred, unless it be a thing specifically forbidden; and as to torts against third parties, even doing a forbidden thing is not always the test, if the agent is acting within the scope of his employment.[4]

**5. SAME — NEGLIGENT ACT WITHIN SCOPE OF EMPLOYMENT.**

Testimony that the driver of the automobile was acting within the scope of his employment by defendant at the time his alleged negligence caused plaintiff's injuries, *held*, sufficient to take the case to the jury, under proper instructions.[5]

**6. TRIAL — CREDIBILITY OF WITNESSES.**

The credibility of witnesses is for the jury.[6]

**7. DAMAGES — PERSONAL INJURIES — EXCESSIVE VERDICT.**

A verdict for $10,000 for personal injuries consisting of a fractured skull, two broken ribs, one injured eye, loosened teeth, seriously sprained spine causing excessive and protracted shock to the nervous system, the effects of which, the testimony showed, may be permanent, cannot be said to be excessive.[7]

Error to Wayne; Webster (Arthur), J.     Submitted April 23, 1925.     (Docket No. 34.)     Decided March 20, 1926.

---

[3]Motor Vehicles, 28 Cyc. p. 39; [4]Agency, 2 C. J. §§ 220, 533; [5]Motor Vehicles, 28 Cyc. p. 48; [6]Trial, 38 Cyc. p. 1518; [7]Damages, 17 C. J. § 408.

Case by Benjamin F. Emery against Henry Ford for personal injuries.   Judgment for plaintiff.   Defendant brings error.   Affirmed.

*Lucking, Hanlon, Lucking & Van Auken* (*P. J. M. Hally,* of counsel), for appellant.

*McClear, Newman, Penniman & Toy* (*Thomas A. Kenney,* of counsel), for appellee.

STEERE, J.   On June 25, 1924, plaintiff recovered a judgment of $10,000 against defendant in the circuit court of Wayne county as damages for personal injuries sustained on March 12, 1919, in an automobile accident while riding from Detroit to Mt. Clemens, caused by the overturning of the Ford car in which he was riding with a man named Villerot, who was driving.   Only the two men were in the car at the time of the accident and their mission together on that occasion was in connection with a senatorial election contest between defendant, Henry Ford, and Truman H. Newberry.   Villerot was one of a number of men employed to represent Ford in transferring the senatorial election ballots, cast throughout the State at the preceding election, from the ballot boxes to temporary receptacles for proper preservation and shipment to Washington available for recount by the United States senate.   Plaintiff was one of the men acting in a like capacity for Newberry.

A certificate of election as United States senator at the fall election of 1918 had been issued to Newberry, and Ford as a rival candidate contested the election. Directed primarily to preservation of the ballots, he instituted an injunction proceeding in the Federal court entitled Henry Ford *v.* Truman H. Newberry and others, wherein an order was entered on March 7, 1919, by consent of counsel for the respective parties, providing in substance that upon proper notice to

counsel for the respective parties arrangements should be promptly made to transfer the senatorial ballots, tally sheets, etc., from ballot boxes throughout the State required for use at the April, 1919, election to temporary receptacles preparatory to the sergeant-at-arms of the United States senate taking possession of them, "such transfers to be made by each custodian in the presence of the representatives of the said Henry Ford and Truman H. Newberry." The temporary receptacles were to be carefully fastened and sealed. All expenses in giving notice of the times and places of transfers and providing the temporary receptacles for such ballots were to be borne by contestant Ford.

In this proceeding Alfred Lucking was attorney for Mr. Ford and James Murfin for Mr. Newberry. They took preliminary steps for harmoniously carrying out the order of the court. Under Mr. Lucking, Mr. Gerald Buckley was placed in direct charge of the details for Mr. Ford, and Mr. E. V. Chilson in like capacity for Mr. Newberry, with authority to cooperate in designating the times and places of transfer to be met by their respective agents or representatives and to witness the transfers. They were authorized to and did employ agents and representatives of their respective sides and provide facilities for that undertaking, including transportation as needed. Both sides had men in their employ while the transfer was in progress who were sent to various polling precincts throughout the State to meet notices or appointments for that purpose. Buckley was in direct charge of Ford's agents and representatives in that service and Chilson of Newberry's. Where such facilities were available those agents usually went to the place of transfer by train or trolley, but where the distance was short or the precincts away from those lines of travel automobiles were frequently used, just how many or often is somewhat in dispute.

Buckley and Chilson directed the details of this work in and from Detroit. It is undisputed that the men actually doing the work throughout the State took their instructions from them. Under their instructions Emery and Villerot had been working together, going to various polling places to supervise the transfers. At the time of the accident, as plaintiff claims, they were going to Mt. Clemens by direction of Buckley and Chilson to provide for and supervise a transfer of the senatorial ballots in that vicinity, making the journey together in a Ford car which Villerot, by order of Buckley, had obtained from a Ford agency at Highland Park for that purpose, and which by his negligent driving he capsized, severely injuring Emery.

The accident as such presented no novel questions of law as applied to the facts in controversy and in its essentials turns on issues of fact for the jury. That the car capsized under Villerot's driving and injured Emery somewhat severely is not disputed, just how seriously and whether permanently is in dispute. The accident occurred on a practically straight strip of paved highway between Detroit and Mt. Clemens along which Villerot was driving, as he said, at a speed of 20 to 22 miles an hour when they saw ahead an approaching car with a motorcycle behind it going at greater speed. As they drew near the motorcycle swung out and passed that car. Villerot testified he slowed down to about 12 miles an hour and turning out to avoid hitting the motorcycle, "when off the road, hit a bump, hit a soft spot in the road, off the regular road," and as he tried to turn back the car turned over. Emery's version is that Villerot's regular speed on the road was faster. As they saw the approaching car some distance away with the motorcycle about to pass it they were going 25 miles an hour or more. He called Villerot's attention to

it and cautioned him to be careful, but he suddenly increased his speed at the wrong time and swung out; that he then cautioned him to look out as he was going to skid but he did not check down and the capsize followed just after the motorcycle passed them on its right side of the road; that Emery himself was knocked unconscious and had no personal knowledge of what immediately ensued.    Other witnesses saw and testified to the circumstances of the accident as observed from their point of view.    There is testimony in the case tending to show that Villerot drove recklessly and the accident was imputable to his negligence.    After a careful consideration of the record on that phase of the case we are of opinion that the questions of Villerot's negligence, plaintiff's contributory negligence and the extent of the latter's injuries were issues of fact, which the court submitted to the jury in a careful and appropriate charge containing no error prejudicial to defendant.

The more urgently argued and fairly debatable question is defendant's liability for Villerot's negligence.    That claim was exhaustively contested for the defense in the court below with pragmatic insistence, which led the court to suggest, "We are trying here to try a lawsuit on the merits," but continual coming resulted in eliminating Buckley's testimony from the case, although both sides refer to it in their briefs. Starting in the record before us at commencement of the trial and reading consecutively through plaintiff's proofs, we find recorded as the second witness—

"Buckley, Gerald, deposition of, was read in evidence, as follows:    Direct-examination by Mr. L." (defendant's counsel).

This direct-examination by defendant's counsel of nine and one-half printed pages is followed by slightly over three pages of "cross-examination" by plaintiff's counsel, after which are about two pages of redirect,

re-cross and re-redirect-examination. The record discloses no objection of any kind to the introduction and reading of this deposition until four days later in the trial, when, near the close of plaintiff's testimony, defendant's counsel called up what he termed "a matter of importance," and making certain statements of an introductory nature disclosed that the matter of importance upon which he wished to be heard was, that while introducing his proof plaintiff's counsel had read Buckley's depositions without announcing that he read them under the provisions of the statute as to an agent of the opposite party (3 Comp. Laws 1915, § 12554), was therefore bound by the witness' testimony and could not impeach or contradict any portion of it. Plaintiff's counsel insisted it was the understanding and agreement that either party might read the depositions in evidence as a substitute for swearing the witnesses in open court in the same manner as though they were produced. The written evidence of this claim was a letter from defendant's counsel of October 24, 1923, stating his understanding as to production of certain other witnesses, saying, amongst other things:

"And, further, that the depositions of Gerald Buckley and Frances Erben, heretofore taken, may be read in evidence upon the trial by either party, without the necessity of again swearing the witnesses in open court."

Because of what the court, after listening to the respective contentions, termed a "misunderstanding," counsel for plaintiff offered, and asked the court, that the record show Buckley's depositions were read and admitted in evidence subject to the provisions of the statute as to an agent of the opposite party, which was insistently opposed by defendant's counsel, and denied by the court. A protracted side-bar and cross-bar debate ensued on that technical issue which covers

some 26 pages of the printed record.    Its details are
not sufficiently illuminating or material to require dis-
cussion, but the ultimate result was that the court
granted defendant's motion to strike out Buckley's
depositions entirely, and later, on defendant's motion,
instructed the jury, amongst other things, that it
was—

"stricken out for all purposes, that is, just the same
as if it had not been testified to, you are in your own
minds to strike out that testimony, forget it, blot it
out entirely."

It is not ours to reason why upon the condition which
confronts us in that particular.    This is an action at
law, tried by jury.    It was for the jury to decide
the issues of fact from the evidence in the case.
Buckley's evidence was stricken out of the case and
the jury so advised with instructions to ignore it in
their deliberations, and it follows that we must do
likewise in determining whether there was evidence
in the case tending to support plaintiff's claim that in
taking Emery with him to Mt. Clemens in the auto-
mobile he drove Villerot was within the scope of his
employment.    He was not violating any' order not to
do so, a controlling distinction in certain cases upon
which defendant relies.    He and Buckley were both
regular employees of defendant, assigned at that time
to the task of transferring and collecting the senatorial
ballots throughout the State for preservation and use
in defendant's election contest, with Buckley in author-
ity over Villerot.

Villerot had been in defendant's service for about
eight years and at the time of the trial was employed
in the purchasing department of the Ford Motor Com-
pany.    Called as a witness for the defense, he testified,
amongst other things, that about two weeks before the
accident he was picked from his department by its
head to report at the office of Ford's attorney in the

Ford building in Detroit in connection with the transfer of those election ballots, and during that service received his instructions from Buckley. He met Emery at Buckley's headquarters prior to the time of the accident, and had done some automobile driving with him in connection with transfers of senatorial ballots in Bay county, using a car which Villerot obtained in Bay City from a Ford dealer. Emery then told him he had been there before and advised him as to what roads to take. The day before the accident (March 11, 1919) they were engaged in that work together at Pontiac. They left the Ford building together on the next morning with instructions to first go to Royal Oak and transfer some ballots there. He remembered hearing some discussion before they left "about Mt. Clemens, and the transfer to be arranged the next day, on the 12th," but denied receiving instructions from Buckley to go there. They went to Royal Oak by trolley on the 12th (the day of the accident), and completed the transfers there by noon. He then called Buckley up by 'phone, and, as he testified:

"Asked him what I should do next. He told me to stop at the Denk-Thompson garage at Highland Park for an automobile and report. Mr. Buckley said to get the automobile and drive down town and report at the office for further instructions. That is all that I remember. * * * We (he and Emery) discussed Mt. Clemens coming back from Royal Oak on the interurban cars. * * *

"*Q.* Now what was it that Mr. Emery said to you about Mt. Clemens, after you left Royal Oak?

"*A.* I can't remember just what he said. He said something about a transfer at Mt. Clemens. It was between 11:20 and 12 o'clock, I would say, we got to Denk-Thompson. Mr. Emery and I went into the office of the garage and inquired about a car that we were supposed to get. * * * We were at the Denk-Thompson before we secured the car about 20 minutes to a half hour. After going down town we

parked the car behind the Ford building and went up to the Lucking office in the Ford building.    I went up there myself to see if Mr. Buckley was in.    *    *    * I didn't find Mr. Buckley.    I didn't find Mr. Buckley at all that noon time.    I didn't get anything at the office that noon time."

He also stated that there were no bags for transfer of the ballots in the car and they got none during the noon hour; that he never received any instructions from Mr. Buckley to go to Mt. Clemens or to take Emery with him.    Asked his reason for going there, he said that Emery suggested they go down to Mt. Clemens to try and locate the keys and seals.    Asked if they always had to locate the keys and seals, he said it was necessary to have them to complete the transfer of ballots.    Asked on cross-examination if he got further instructions when he called up Buckley from Royal Oak and asked for them, he answered as follows:

"I got instructions to stop off at Highland Park and get an automobile.    *    *    *

"Q. For what?

"A. For a transfer perhaps that afternoon of some outlying township.

"Q. Where?

"A. No definite place set."

Emery testified that he was present on the morning of that day when Buckley and Chilson gave them their instructions.    He and Villerot were to go to Royal Oak first and transfer the ballots there.    Mr. Buckley told him to proceed to Royal Oak where they would make transfer and then go to Mt. Clemens.    The arrangement as he heard and understood it was that, if possible, they were to make both Royal Oak and Mt. Clemens that day, saying:

"We received instructions on the morning of the 12th in regard to the visit to Royal Oak and to Mt. Clemens.    The arrangement was to proceed to Mt. Clemens, transfer the ballots in the city of Mt. Clemens, and to conclude the work that day if possible.    If

not, finish it in the morning, and then proceed to the several townships."

Chilson was one of the two men put in direct charge of the details of collecting the ballots. He testified that his instructions when he took up the work were to assist in the transfer all over the State as rapidly as it could be done and he was in almost daily conference with Buckley at his office in the Ford building, "sometimes two or three times a day." Of their method of carrying on the work, he explained:

"My practice was at this time to agree with Mr. Buckley that on such and such a day the ballots should be transferred at such and such a town, according to some 'phone conversation or telegram or something of that sort that either I or Mr. Buckley might receive from the election officials out in the State. For illustration, if some communication by way of 'phone or telegram had been received from a town like Howell, or any other town in Michigan, that got to my office, I would communicate with Buckley and tell him about it. If it came to him, he would communicate with me. We would then look over our schedule of what work we had on hand of different other towns or districts to transfer. And we would say, perhaps, we can cover that point two days from now, and we would agree on that. * * * It was Mr. Ford's duty, through Buckley, and through these different representatives, to see that the temporary receptacles or bags were gotten to the place in time. I had nothing to do with furnishing the receptacles. They presented their receptacles, we agreed to it, and said it was satisfactory."

Of their arranging for the trip in which the accident occurred, he said, in part:

"Mr. Buckley called me and said it was necessary to make a change in the schedule. Something had occurred in Macomb county that necessitated an immediate collection of ballots in that county. If I recall it, it was some extra or special election to be held in that county. I am not positive about that. I said, 'Very well, Mr. Villerot and Mr. Emery were to

be at Royal Oak or are at Royal Oak.    I will communicate with Mr. Emery and have him at Mt. Clemens tomorrow morning.'    Mr. Buckley said he would do likewise with their representative, and to speed matters up they would provide a car and Mr. Villerot, their representative, and Mr. Emery, our representative, would drive to Mt. Clemens if we could get them together.    I said, 'that is perfectly satisfactory to us.'    *    *    *    I was the man that directed Mr. Emery at all times, he was under my orders.    He was not under Mr. Buckley's orders at all, only as the combination worked out.    Mr. Emery did not undertake to do anything unless I ordered him to do it, as to time and place of transferring ballots. *    *    *    And Mr. Buckley's men always followed his orders as to time and place, so far as I know.    I had no direction of their men.

"Q. You had no right to direct a Ford man as to time and place?

"A. Only as we agreed upon things.

"Q. Only as you and Buckley had previously agreed on it, certainly?

"A. Yes, sir.    *    *    *

"Q. Was there any reason why on March 12 or 13, Mr. Emery could not have gone to Mt. Clemens on the street car, so far as Mr. Newberry's interests were concerned?

"A. No.

"Q. Did you order him to ride out there with Villerot?

"A. Yes, after Mr. Buckley had said they wanted the car used.

"Q. They wanted the car used?

"A. Which he frequently did.

"Q. Just a moment.    Never mind frequently. What do you mean, frequently, about Mt. Clemens?

"A. No, throughout the State.

"Q. Well, to reach points out in the State?

"A. They preferred to furnish the car they said.

"Q. Who said that?

"A. Mr. Buckley.

"Q. When?

"A. Shortly after we started work.

"Q. When was that, in the fall?

"*A.* Shortly after we started work on transferring the ballots.

"*Q.* And there were points in the State that could not be reached by rapid railway or street car or railroad that you had to witness a transfer?

"*A.* Oh, yes, a great many.  *  *  *  this arrangement about the cars was their own suggestion.

"*Q.* When was it that he said that about Mt. Clemens?

"*A.* Shortly after—well the day that we agreed to make the transfer at Mt. Clemens, or the day previous.

"*Q.* Had that been scheduled for four or five days?

"*A.* No, it was a quick shift, something unexpected came up, as I told you.

"*Q.* This was scheduled at Mt. Clemens for March 13 in the morning?

"*A.* I think so.

"*Q.* Was there any reason why Emery had to go out in an automobile that afternoon, then, to get that transfer?

"*A.* I don't think that is true.    The transfer was to be made the same day that they left to make the transfer."

We have no difficulty in concluding there is competent testimony in this record from which the jury could legitimately find that Villerot was directed by Buckley to get the car as he did and take Emery with him to Mt. Clemens for purposes of the transfer pursuant to the arrangement made between Buckley and Chilson, to which the latter testified.    The remaining question on that phase of the case is whether there is any competent testimony in the record showing directly or by fair inference that in so doing Buckley was acting within the scope of his authority.

Defendant Ford, called by plaintiff under the statute, testified briefly, consistently, and comprehensively as to his participation in this transfer of ballots.    His entire testimony is as follows:

"I filed a petition in the United States (court?) to preserve the senatorial ballots.    Mr. Liebold was acting for me in all these matters.    Mr. Liebold repre-

sents me.   He is my general secretary, and he repre-
sents me in a great many things.   He does anything
that I designate him to do, that I lay out for him to
do.   He signs checks for me and has the complete
management of many of my affairs.   He had full
power to act for me in this senatorial controversy.
Mr. Liebold had charge of this recount and the transfer
of ballots.   He had full power to hire whoever he
desired and go to any expense necessary, and I paid
for it."

Liebold testified that he was direct agent for de-
fendant in a great many things, with authority to
sign checks and transact general business.   He knew
of defendant's suit in the Federal court relative to
preserving the senatorial ballots, and when Alfred
Lucking, who handled the matter before the senate
committee and as attorney for defendant, arranged for
modifying the restraining order as to the ballot boxes
so that the boxes could be used at the ensuing election,
he discussed the matter with him, and first testified
as follows:

"The office of Mr. Alfred Lucking looked after the
transfer of both ballots in detail for Mr. Ford.   Mr.
Buckley was formerly employed by the Ford Motor
Company and was supplied as a man to carry out that
work.   I had knowledge at the time that he was there
for that work.   He was to do what he was told to
do either jointly by—whatever he was instructed by
me, or whatever Mr. Lucking instructed him to do.
He looked after the counting of the ballots and saw that
the men were sent to the proper place, and scheduled
the towns where they were to be received, and so on.
He was directed to do that.   That was part of his
work.   I know Mr. Villerot.   I met him once or twice
prior to the counting of the ballots.   He was taken
out of the Ford Motor Company to supply some neces-
sary help for that work.   I did not hire him.   He
was paid by Henry Ford.   Mr. Buckley's salary was
paid from Mr. Ford's funds.   I know that Mr.
Buckley was one of the men that was going down to
the Lucking office.   I act for Mr. Ford whenever I
feel there is occasion for me to use my own judgment,

and have a right many times to act without consulting him."

In direct-examination by defendant's counsel, he testified that he first heard of the accident "possibly a year after" and until then had not learned that any of Ford's witnesses had transported a Newberry witness anywhere, and he never understood it was any part of defendant's duty to do so. On cross-examination he was asked and answered: .

"*Q.* As a matter of fact, Mr. Liebold, you never discussed the question of transportation or how the men were going to travel, at all, with Mr. Lucking, did you?

"*A.* No, I never did.

"*Q.* This matter was left, after the details of the transfer, to the office of Mr. Lucking, and Mr. Buckley?

"*A.* Well, to a certain extent, it was, yes. * * *

"*Q.* Whom do you mean by we? You say 'We were in constant consultation' in case of any emergency arising?

"*A.* Mr. Alfred Lucking and myself.

"*Q.* You consulted with Mr. Buckley?

"*A.* Well, possibly, if he was in the office, and anything happened that we were talking about, he might be called in to discuss it. * * *

"*Q.* Was there any discussion in regard to how the Ford men should get to these places in Detroit and immediate vicinity?

"*A.* Not between us.

"*Q.* You left the schedules entirely to them?

"*A.* In detail, yes.

"*Q.* Did you O. K. the bills?

"*A.* I did after they were all paid and turned in, yes, approved them. * * *

"*Q.* As a matter of fact, Mr. Liebold, isn't this true, that about the only time you would consult him at all in connection with the transfer of these ballots is when Mr. Lucking saw fit to call you?

"*A.* Well, yes, when he called me. I would usually go down to his office or he would discuss matters over the 'phone. I might be there once a week, I might

be there once in two weeks, but we were in constant communication.

"*Q.* There were lots of times when you were out of the city?

"*A.* Yes, I was out of the city at different times.

"*Q.* During those times did Mr. Lucking handle the matter?

"*A.* He would, yes.

"*Q.* With full authority to go ahead as he saw fit?

"*A.* For the time being, yes.  *  *  *  If there had been any change made in the schedules by reason of some circumstances from the regular schedules of dates and places for transfers, I would not bother about that."

It is undisputed that both Buckley and Villerot were at the time of the accident in the service of defendant, assigned as his agents to the task of transferring, collecting and preserving these ballots for his use in the senatorial election contest he had inaugurated. Primarily, Newberry had no interest in the preservation or transfer of these ballots, but as it was done at the instance of Ford, he had, and was granted by the court, the right of notice and opportunity to see that it was properly done.   Legally the initiative and burden of this work rested on defendant.   By co-operation of counsel under authority of their respective clients the undertaking was planned and the task efficiently and expeditiously performed.

It seems idle to quibble over whether or not Ford's agents, or Newberry's, had express authority direct from them to use automobiles in that work.   It covered the entire State and contemplated every voting precinct in it, many of which were in villages and townships off the lines of trolley or steam railway transportation.   Under the statute the sealed ballot box was in charge of the clerk, its keys held by the chairman of the election board and the seal in the hands of one of the election inspectors.   If no mutual arrangements were made to have them assembled by

their custodians at the county seat or some other convenient place for legal transfer the inspecting agents taking defendant's bags for transfer would have to ride or walk by highways to where they were. Even Secretary Liebold would scarcely contend that by auto was not the most expeditious and economical way of meeting such a situation. The very fact, as Liebold tells, that transportation was never discussed or "never even thought of" implied authority for those in charge of the details to obtain such means of transportation as they thought best served the undertaking in which they were employed. Neither was, carrying the other's agent who was assigned to the same inspection entirely one-sided in this co-operative undertaking. A witness for defendant named Lile, who was in the service of defendant and took part for a time in the transfer work in the northern part of the State, reporting to Buckley, told of two instances in the short time he was in that service where Newberry agents furnished free to him and drove the auto in which they made their trips out into the country to make transfers. Whether they owned or hired the cars they drove, or whether Ford ever paid for the use of a Ford car, is beside the mark. Liebold admits that as defendant's agent he paid for repairing the damages done to the car when Villerot capsized it at the time of the accident. It is not shown that Villerot or Emery had any other reason for going to Mt. Clemens than the work in which they were engaged, nor that Buckley had any other reason for ordering Villerot to get the car that day. Even Villerot, who denies that he was instructed to go to Mt. Clemens, but went, understood it was to be used in that line of work, or, as he said, "for transfer perhaps that afternoon of some outlying townships."

Liebold testified that Mr. Lucking's office looked after the transfer of the ballots, and Buckley, who was

in defendant's employ, "was supplied as a man to carry out that work." Buckley had a desk there, and carried out that work in and from there. Chilson, who acted in like capacity for Newberry, visited and conferred with him there almost daily and the men under him who were doing the actual transferring through the State took their orders from and reported to him there. That he was under the general supervision of Ford's attorney, or Liebold, and subject to such instructions as they saw fit to give him, is not questioned, neither is there any proof that in carrying out that work he ever did anything which they told him not to do or violated any instructions they gave him.

In the law of agency it is a fundamental principle that every delegation of power carries with it authority to do all things which are reasonably necessary or proper to efficiently carry into effect the power conferred, unless it be a thing specifically forbidden; and as to torts against third parties, even doing a forbidden thing is not always the test, if the agent is acting within the scope of his employment (*Richard* v. *Manufacturing Co.*, 79 N. H. 380 [109 Atl. 88]; 2 C. J. p. 848).

We find there is ample testimony to carry the case to the jury on plaintiff's theory that Villerot and Emery were acting together in the prosecution of their respective employers' business as instructed by those in authority over them, in a joint journey to make a transfer requiring a representative of each side to be present and to expedite the work, or "speed matters up," they were as Buckley had proposed going in a car furnished by defendant which his agent Villerot was driving.

"The question whether the act complained of was within the course of the employment,—the question whether the servant did the act on his own account or on his master's,—the question whether the servant

has simply made a detour or has entirely departed from the master's service—these are questions which, when the facts are in dispute, or, though the facts are not in dispute, when more than one inference can reasonably be drawn from them, are questions for the jury under proper instructions from the court." 2 Mechem on Agency (2d Ed.), p. 1491.

Those questions were rightly submitted to the jury by the court with plain and proper instructions, including supplemental requests by defendant, fully as favorable to the defense as any authority sustains.

It is also insisted that the case should be reversed because the verdict is excessive. Eliminating Emery's testimony as to his injuries, which runs in the superlative but was for the jury to pass upon, there was other practically undisputed testimony, mostly medical, showing that he sustained a fractured skull, two broken ribs, an injured eye, loosened teeth and seriously sprained spine, causing excessive and protracted shock to his nervous system.

Dr. H. W. Hewitt, a practicing physician on the staff of the Grace hospital, testified that when Emery was brought there after the accident and he first saw him he was in a dazed condition and not entirely conscious, was nauseated and had a subnormal pulse; further saying, in part, as follows:

"I found he had a fracture of the skull, his left eye was swollen, his ninth and tenth ribs on his right side were broken. * * * His left hip joint was limited considerably in the motion we call flexion. * * * He had several abrasions about different parts of his body, especially on his legs and shoulders and other parts. We had several X-rays taken. Since leaving the hospital Mr. Emery has been under my observation. * * * I have a full understanding of his condition. Mr. Emery's fracture was located on the left side of his head, starting up around in the temporal region, or a little further up, and had two or three fracture lines down this way, and one went

around to the base of the skull.  *  *  *  The effect of such a fracture on a man's general health and capacity depends entirely on the injury to the brain at the time.    I ascertained what the injury to the brain was.    The effect on the nervous system would be to produce a condition of emotional shock, and later a nervous exhaustion.    That would be permanent in its character in many cases.    It is in Mr. Emery's case.    I don't believe he ever will make a complete recovery.  *  *  *  The result of this fracture was that it increased the intra-cranial pressure, that is, the pressure inside of the brain; and the direct result of that was a semi-conscious condition; and the ultimate result is more or less permanent injury to the nervous system in general.    I should say that this injury produces a permanent defect.    This injury resulted in a condition of nervous exhaustion.    The symptoms of nervous exhaustion are lack of endurance, both physical and mental."

Dr. Clark, a specialist in nervous and mental diseases who had belonged to the Grace Hospital staff for seven years, testified that on March 24th, having been called into conference by Dr. Hewitt, he examined Emery, saying, in part:

"I found him in bed in a subconscious condition, or cloudy mental condition, facial expression and general conduct was one of a person suffering considerable pain, symptoms of skull fracture, pains in temple region, left eye swollen and edamatous, central and latter incisors of jaw loose.  *  *  *  On the 28th his pulse was 60, temperature was 97, his respiration was 18.    On the following day his condition was unsatisfactory.    Did a lumbar puncture and spinal pressure.    The spinal fluid much increased, amber color, instead of being the usual about 12 to 14 drops, I found it much increased.    The spinal fluid shot out across the bed when I pulled out this trocar.    It was an amber color.    That denotes presence of blood in the cerebral spinal fluid.    It would come from the spinal canal, the space around the spinal cord.  *  *  *  I saw him (Emery) yesterday between the hours of 3 and 5:15.    Dr. Hewitt was present."

Asked if there was any chance of his making an ultimate recovery, he replied as follows:

"Sometimes, in a small percentage of such excessive cases, extensive injuries as I observed, to these plates, the result of fracture of the skull and his general symptoms, sometimes a few, a small margin apparently, recover near normal until such a time as something comes along and tips them over, some little accident or something, and down they go again. It is few that really recover at his age, that make a permanent recovery. * * * He is somewhat improved from what I saw him in November, 1919. As to his future, I can only judge by those I have attended in the past. I would say that it was uncertain about his recovery; but I question in my own mind that he ever will completely recover."

To the contrary of this, Villerot testified that Emery was able to talk intelligently and to walk after the accident; that he rode back with him to Detroit that evening and took a street car to return alone to his own home. Certain men employed to shadow Emery after he left the hospital testified to his physical activities as they observed him when he did not know any one was watching, in marked contrast to his assumed crippled condition and manifestations of pain when conscious that he was under observation. Defendant's only medical testimony was that of Dr. Klingman of Ann Arbor, an expert in nervous and medical diseases, who, in answer to hypothetical questions, gave extended qualified replies tending to show that Emery's injuries from the accident were not permanent.

The credibility of all these witnesses was for the jury. And if they believed the testimony of plaintiff's witnesses we cannot say that the amount of their verdict was excessive.

Defendant's many other assignments of error have been carefully examined but we do not find them calling for serious discussion. The rules of law ap-

plicable to this case are well settled and the case was submitted to the jury on the facts under a full and fair charge in which we find no reversible error.

The judgment will stand affirmed.

SHARPE, FELLOWS, WIEST, CLARK, and MCDONALD, JJ., concurred.    BIRD, C. J., did not sit.

Justice MOORE took no part in this decision.