**WINDSOR STEEL PRODUCTS, Ltd., a Foreign Corporation, Plaintiff,**

v.

**WHIZZER INDUSTRIES, Inc., a Michigan Corporation, Defendant.**

Civ. A. Nos. 15570, 15829.

United States District Court
E. D. Michigan, S. D.

Nov. 18, 1957.

L. Edwin Wenger, Detroit, Mich., for plaintiff.

Addison D. Connor, Butzel, Eaman, Long, Gust & Kennedy, Detroit, Mich., for defendant.

LEVIN, District Judge.

These two actions brought for breach of contract were consolidated for trial. Plaintiff, Windsor Steel Products, Ltd., a Canadian corporation, filed a complaint alleging that the defendant, Whizzer Industries, Inc., a Michigan corporation, ordered and received from the plaintiff, but has refused to pay for, certain metal heater frames and electric glass heating elements, in the amount of $11,740.84. In a second complaint plaintiff alleged that the defendant ordered, but refused to accept, delivery of frames of the value of $25,159.35 and glass of the value of $7,371.50. The defendant, as a defense to both actions, contends that the glass already delivered was defective in breach of both express and implied warranties of sale, and asserts a counterclaim for damages in the amount of $38,188.94.

The parties agree that the merchandise was ordered by the defendant and that the frames are in no way defective, but that the glass heating elements were unfit for use because they frequently shattered within a short time after the heaters were connected to an electric current. It is also agreed by the parties and it is apparent to the court that the defects in the glass elements are traceable directly and entirely to the manufacturer of the glass, Duplate Canada, Ltd.

The frames and glass were delivered by the plaintiff pursuant to purchase orders issued by the defendant. The defendant, in opposing the claim of the plaintiff, asserts that the express warranties in the purchase orders and the warranties implied by the Michigan Sales Act bar recovery by the plaintiff while giving the defendant the right to recover on the counterclaim. The purchase orders contained this language:

"The seller expressly warrants that all material when delivered by you will conform to the specifications, drawings, samples or other description furnished to seller by us, and will be of good material and workmanship, and free from defect, and will satisfactorily perform the functions for which intended."

The sections of the Sales Act relied on read:

"(1) Where the buyer, expressly or by implication, makes known to

the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose.

"(2) Where the goods are bought by description from a seller who deals in goods of that description, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be of merchantable quality.  *  *  *

"(6) An express warranty or condition does not negative a warranty or condition implied under this act unless inconsistent therewith."  M.S.A. sec. 19.255 (1937), Comp.Laws 1948, § 440.15.

■■ Plaintiff, however, states that the purchase orders do not represent the complete understanding of the parties. It is clear that if these written orders are a complete and integrated record of the agreement of the parties they cannot be varied or contradicted by parol evidence and the defendant is entitled to rely on the warranties asserted. DiPonio v. Garden City, 1948, 320 Mich. 230, 30 N.W.2d 849; Stepanian v. Moskovitz, 1925, 232 Mich. 630, 206 N.W. 359. However, the parol evidence rule, which is not a rule of evidence but a rule of substantive law, does not bar the use of oral evidence to show the true agreement of the parties where it appears from the surrounding facts and circumstances that the writing was not an integration of the entire transaction.

The Supreme Court of Michigan, speaking on this question, said:

" 'The fundamental question is one of the intent of the parties. Did they intend to make the writing the repository of their final understanding upon the particular matter of agreement as to which evidence is offered dehors the writing? If so, such evidence [i. e. parol evidence] must be excluded. If, however, it appears that the parties intended to restrict the writings to specific subjects of negotiation, then other subjects may be proven "even though they be (as they always are) different from the writing."  5 Wigmore on Evidence (2d Ed.) § 2431. This intent is to be sought in the conduct and language of the parties and the surrounding circumstances.' "  Brady v. Central Excavators, Inc., 1947, 316 Mich. 594, 608, 25 N.W.2d 630, 635.

For discussion of this rule see 3 Corbin on Contracts, Sec. 573 et seq., p. 215 (1951); 9 Wigmore on Evidence, 3d ed., Sec. 2400 et seq., p. 3 (1940); 3 Williston on Contracts, Rev.Ed., Sec. 631 et seq., p. 1813 (1936).

We then turn to the facts and surrounding circumstances. In 1952 the plaintiff's president, Haven Kimmerly, and another Canadian manufacturer were approached by Donald Heckman who had been a Canadian distributor for an American made line of electric glass heaters. Heckman showed both manufacturers an American model of an electric glass heater and took their bids for the manufacture of the metal frames. He awarded the contract to the plaintiff and directed the plaintiff to copy the American sample with minor changes. Plaintiff produced such a model and Heckman arranged for the plaintiff to assemble completed units composed of the frames the plaintiff manufactured, and the glass heating elements which Heckman was to supply.

Heckman originally purchased the glass for the units from the Blue Ridge Glass Corp. of Kingsport, Tennessee. In 1952 he attempted to buy glass from Duplate Canada, Ltd. but Duplate refused to sell to Heckman without some guarantee of his credit. Heckman then persuaded the plaintiff, Windsor Steel Products, Ltd., to buy the Duplate glass for him.

To market these heaters to which he assigned his own model numbers, Heckman organized the Radiant Electric Heating Company, the name of which

was later changed to Infraglass Radiant Electrical Heating, Ltd. of Canada. When he realized that the market for heaters in Canada was limited, he decided to produce and sell his heaters in the United States. Since his finances were insufficient to carry out this operation, he in 1954 enlisted the aid of Martin Goldman, the treasurer and controlling stockholder of the defendant, Whizzer Industries, Inc. In June of 1954 a contract was signed by Heckman and Whizzer Industries, whereby Whizzer Industries agreed to the "purchasing, financing, assembly, packaging and shipment" of electrical glass heaters. The heaters were to be assembled in accordance with Heckman's specifications then in effect. It was also agreed that Whizzer would manufacture models thereafter designed by Heckman if Whizzer approved the new designs.

Heckman agreed to register his heater design in the United States within one year from the date of the contract and to devote his time, facilities and finances to the development of sales of the heaters. The contract was to be in effect for a period of ten years. Whizzer Industries was to receive a fee for its services on each heater. On November 15, 1954 Whizzer Industries and Heckman incorporated a United States company known as the Infraglass Heating Company, Inc. to distribute the heaters. Heckman and Whizzer Industries each contributed fifty per cent of the capital and received fifty per cent of the stock of that company.

While the contract required Whizzer Industries to "manufacture" the heaters, the parties understood that this meant to assemble the heaters from component parts which were manufactured elsewhere. The metal frames were to be manufactured by Windsor Steel which had no sales organization but merely manufactured commodities to customer specifications on a contract basis. The glass was to be secured from Duplate and other parts such as thermostats, ceramic knobs, wiring and ceramic tape were to be purchased from other sources.

At the inception of the American operation, Heckman learned from Duplate's attorneys that Duplate glass could not be sold directly to buyers outside of Canada because of a restriction in the Belgian patent license under which Duplate was operating, and therefore it could not sell directly to Whizzer. The Duplate attorneys told Heckman, however, that if title to the glass passed from Duplate to a purchaser in Canada before entering the United States, Duplate could make the sale.

Heckman apparently was not able to make the purchase through Infraglass Radiant Electrical Heating, Ltd., his Canadian corporation, for Duplate, as previously stated, refused to sell to it without some guarantee of that corporation's credit. He, therefore, arranged with Haven Kimmerly for Windsor Steel to take title to the glass in Canada, as "purchaser" and to "transfer" the glass to Whizzer Industries. Windsor Steel actually made the purchases through a wholly-owned subsidiary, Lincoln Specialties, Ltd. Since this formality does not affect the basic transactions, Windsor Steel will hereafter be referred to as the purchaser from Duplate.

When the glass arrived at Windsor's plant it was held in the unopened original cartons to be picked up by Whizzer. Windsor was to bill and did bill Whizzer at the price Windsor paid Duplate, plus freight charges. Windsor made no profit on the transfer of the glass. The evidence also shows that whenever Whizzer received complaints about defective glass such complaints were not brought to the attention of Windsor but were taken up directly with Duplate.

■ It is apparent from the surrounding facts and circumstances that the purchase orders did not represent the complete and integrated agreement of the parties with respect to the transfer of the glass. Therefore parol evidence is admissible to show this true agreement. Cf. Scarne's Challenge, Inc. v. M. D. Orum Co., 1954, 267 Wis. 134, 64 N.W.2d

836. See, also, Yezbak v. Croce, 1952, 370 Pa. 263, 88 A.2d 80; Ward v. Zeigler, 1926, 285 Pa. 557, 132 A. 798. On the basis of all the evidence I am satisfied that it was not intended that Windsor sell glass to Whizzer but that Windsor agreed to take title from Duplate as an accommodation for Whizzer. I find that the parties agreed to establish a purchasing agency for the transfer of the glass and not a vendor, vendee relationship as the defendant alleges. Cf. Hatch v. McBrien, 1890, 83 Mich. 159, 47 N.W. 214; Foley v. Nimocks, 1916, 175 Iowa 464, 157 N.W. 178; Carmichael v. Lavengood, 1942, 112 Ind.App. 144, 44 N.E.2d 177. It is plain from both the language of the Michigan Sales Act and the express warranty of the purchase orders that these warranties are intended to apply to sale transactions only. Since the parties established a purchasing agency rather than a vendor, vendee relationship for the transfer of the glass no warranties attached to this transfer. Thus the purchase orders with reference to the glass served only as written directions from principal to agent for shipment and billing purposes.

The defendant contends, nevertheless, that Heckman was acting either for Windsor Steel or for himself but that in any event he had no authority to represent Whizzer Industries.

The claim that he was acting for Windsor Steel is based on an allegation that Whizzer Industries never was concerned about the source of the parts of the heater but bought only completed units from Windsor Steel. The evidence shows, however, that the only parts manufactured by Windsor Steel were the frames. All other parts were bought from various manufacturers and assembled by the defendants. Indeed, the defendant in its contract with Heckman characterized itself as the "manufacturer" of the appliances.

■ The assertion that Heckman was acting for himself when he dealt with Windsor also deserves only brief discussion. The contract that Whizzer negotiated with Heckman states that Whizzer was to do the purchasing and assembling. The purchase orders that were given to Windsor were made by Whizzer and not Heckman. Payment for the frames and glass were remitted by Whizzer. In the light of these facts and other aspects of the relationship between Heckman and Whizzer referred to in this opinion, defendant's contention that Heckman was acting for himself in his dealings with Windsor is without substance.

■ We next proceed to the question of whether Heckman had authority to represent Whizzer. Authority may be actual or apparent. Actual authority means "the power which 'a principal intentionally confers upon the agent, or intentionally or by want of ordinary care allows the agent to believe himself to possess.'" Cahan v. Empire Trust Co., 2 Cir., 1926, 9 F.2d 713, 715. Reasonable reliance in good faith upon the consent manifested by the alleged principal is the basis of apparent authority. The Supreme Court of Michigan has defined apparent authority as follows:

"Whenever a principal has placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in assuming that such agent is authorized to perform in behalf of the principal, the particular act, and such particular act has been performed, the principal is estopped from denying the agent's authority to perform it." Maryland Casualty Co. v. Moon, 1925, 231 Mich. 56, 62, 203 N.W. 885, 887.

Actual and apparent authority is to be gathered from all the facts and circumstances properly admitted in evidence. The facts and circumstances are: When Heckman approached Whizzer Industries to obtain financial aid Whizzer had no experience in either the manufacture, assembly or sale of heater units. Heckman had this knowledge. As stated previously, he had induced Windsor to manu-

facture and assemble a unit for him that he had marketed in Canada. He and not Whizzer had the knowledge as to the type of glass to be used and the sources of supply. Many of the purchase orders were noted, "price per agreement with Don Heckman." Many of the early purchase orders were marked, "confirming order" and the evidence establishes that Heckman had verbally placed the orders that were later confirmed by Whizzer. All the purchase orders indicate that the materials were for the "Infraglass" Dept. This obviously had reference to Infraglass Heating Company, Inc. of which Heckman and Whizzer each owned fifty per cent of the stock. As stated earlier, whenever Whizzer received complaints about defective glass, Heckman conferred with Duplate about them and made arrangements for replacement and adjustment; and later, when Windsor refused to purchase any more glass on behalf of Whizzer, it was Heckman who ordered and was then able to obtain glass through Heckman's Canadian firm, Infraglass Radiant Electrical Heating, Ltd. It was also Heckman who conveyed directions for specification changes in the frames to Windsor on behalf of Whizzer.

The arrangement to obtain the glass by a purchasing agency was an efficient, economical and lawful method of obtaining glass that was otherwise unavailable. The rule in Michigan is that an agent has authority to perform all acts incidental to the exercise of his authority. See, e. g., Emery v. Ford, 1925, 234 Mich. 11, 207 N.W. 856, 861, which states:

"In the law of agency, it is a fundamental principle that every delegation of power carries with it authority to do all things which are reasonably necessary or proper to efficiently carry into effect the power conferred, unless it be a thing specifically forbidden." See, also, Wilson v. Livingston County Mut. Fire Ins. Co., 1932, 259 Mich. 25, 242 N.W. 827.

I find that Heckman had not only the apparent authority but also the actual authority to represent Whizzer in its dealings with Windsor to secure the frames and glass for the "assembly" of the heating units, including the authority to arrange for Windsor to act as purchasing agent for Whizzer for the purchase of the Duplate glass.

Accordingly, the plaintiff is entitled to recover from the defendant and the defendant's counterclaim is denied.

The only question that remains is the amount of damages the plaintiff has suffered. The amount for goods already delivered, $11,740.84, is not disputed and is allowed. However, additional evidence should be presented on several important items of damages and I shall, within a few days, fix a date for such hearing to ascertain:

1. The market value on the date of cancellation of the frames, ordered by and made for the defendant but which the defendant refused to accept.

2. The plaintiff's miscellaneous expenses of storage, insurance, etc. which are attributable to the frames and glass held for the defendant.

3. Liability for glass incurred by plaintiff in behalf of defendant for which plaintiff has not been reimbursed.