### KNIT WITS (WILEY) et al.
### v.
### UNITED STATES.
Reap. Dec. 11401;
Reappraisement R65/1415.

United States Customs Court.
Nov. 21, 1967.

Glad & Tuttle, San Francisco, Cal. (Edward N. Glad, San Francisco, Cal., of counsel) for plaintiffs.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Mollie Strum, New York City, trial atty.), for defendant.

WILSON, Judge:

The merchandise involved in the above 191 appeals for reappraisement, which were consolidated for trial (R.9), consists of a quantity of wool knitwear for women manufactured in Italy by several manufacturers and exported to the United States during the period from July 1960 through August 1963.

Counsel stipulated that export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165, is the proper basis for appraisement; that the imported merchandise does not appear on the final list, 93 Treas. Dec. 14, T.D. 54521, which was promulgated under the said simplification act, and that the official entry papers in all of the consolidated cases be admitted in evidence without being marked (R.10, 11).

The official papers show that appraisements were made at the f. o. b. Milano prices shown in some of the invoices as the "export prices" and in

others as the "home" prices. Entry was made by deducting the invoiced item of alleged "5% commission on export prices" and "stamps" or by deducting "Buying Agents Commission" and "stamps" from the "export prices" or from the "home" prices. The appraised values less 5 percent in either event are equal to the unit entered values.

There are two primary questions in issue: (1) whether Leon S. Sassoon, also referred to as the Sassoon group, shown as seller in some instances and as shipper in other instances, was in fact a buying agent for plaintiff, Knit Wits, and entitled to 5 percent as a *bona fide* buying commission, and (2) whether the invoiced 5 percent commission on export prices or home prices, as the case may be, was in fact included in the appraised values.

As there is no dispute concerning the basis for appraisement, there is no need to quote the export value statute as amended, supra.

All of the evidence introduced is documentary except for the testimony of one witness. The plaintiffs introduced four written exhibits briefly described as follows: exhibit 1, an affidavit sworn to on June 20, 1966, by one Ezra L. Sassoon of Milano, Italy; exhibit 2, a letter signed by Leon S. Sassoon and Selim E. Haiat directed to Minkap of California, and all affiliated companies, under date of December 8, 1958; exhibit 3, a letter addressed to Mr. Larry Taylor, Knit Wits for Men, under date of February 8, 1962, signed by Zuri, identified as Ezra L. Sassoon; and collective exhibit 4, two notices dated November 17, 1964, directed by the United States Bureau of Customs to Knit Wits, advising the importer of an increase in duties. The defendant introduced six documents, to wit: exhibit A, a subpoena which had been served upon Mr. Larry Taylor, the president of Knit Wits; collective exhibit B which consists of certain confirmations of orders from Donato Fiani & Figli; collective exhibit C containing a number of papers marked for identification only; collective exhibit D consisting of a photostatic copy of a letter dated February 27, 1959, addressed to Mr. Larry Taylor from Selim E. Haiat; exhibit E, a photostatic copy of a letter dated July 15, 1960, directed to Knit Wits for Men and signed by Zuri; and collective exhibit F consisting of a group of agents' reports.

Only one witness testified in court, i. e., Larry Taylor, the president of Knit Wits, one of the plaintiffs herein. He is also president of Minkap of California, and vice president of Styles for Boys. For all practical purposes, it appears that Mr. Taylor owned and managed these three corporations. He testified that, in connection with the operation of these companies, he visited various countries to study the knitwear manufacturing business and the markets relating to the exportation of such merchandise. However, we are concerned here only with knitwear manufacturing in, and exportation from, Italy. Mr. Taylor visited Italy numerous times. On his first visit with one Leon S. Sassoon, his son Ezra L. Sassoon, and his stepson Selim E. Haiat, acting as guides and interpreters, he called upon a large number of knitwear manufacturers in the area of Milano, Italy. Little was accomplished during the first visit, however, according to the witness. He designated this visit as just "an exploratory trip" designed to acquaint him with the Italian market and to determine whether knitwear manufactured in Italy could meet Japanese competition.

The witness stated that in the beginning no definite arrangements were made with the Sassoons concerning the purchase and shipment of knitwear from Italy but "it was always assumed that they would act as our agents" (R.22-23). The witness stated that he discussed with Mr. Sassoon, his son Ezra, and his stepson Selim E. Haiat, herein also referred to as the Sassoon group, the proposal that the latter act as his agents in developing an export business in knitwear merchandise from Italy. During the latter part of 1957 and the year 1958, the Sassoon group sent Mr. Taylor and

Knit Wits a large number of samples of knitwear which they thought suitable for the American market. However, none of these samples proved satisfactory for Mr. Taylor's commercial plans in the United States. Therefore, toward the end of the year 1958, Mr. Taylor sent certain samples from the United States to the Sassoons in Italy to indicate the type of merchandise he would purchase. On the 8th of December 1958, a letter (plaintiffs' exhibit 2) was written by Leon S. Sassoon and Selim E. Haiat, his stepson, to Minkap of California and affiliated companies represented by the witness Taylor, in which Mr. Sassoon and Mr. Haiat set forth the conditions under which they would be willing to purchase in Italy and ship to the United States knitwear of the type desired by Mr. Taylor. The witness testified he approved all the provisions in this letter except paragraph 6 which specified that the invoices covering the goods shipped would list the Sassoon commission separately from the purchase price paid the manufacturers. Paragraph 1 of the above-mentioned letter stated that—

> You have nominated us as your exclusive Buying Agents for Italy working on 5% (Five per cent) commission basis for all direct or indirect orders that you will place in Italy.

Mr. Taylor testified that he wrote the Sassoons accepting the terms of this letter, except paragraph 6 thereof. He was unable to produce a copy of any such letter. The witness asserted in his testimony, however, that all shipments made thereafter were according to the understanding set forth in the letter (exhibit 2).

On cross-examination Mr. Taylor testified as follows:

Q. Now, were the prices on the confirmation of orders which I have shown you the ones which were the prices which you paid?—A. Yes, it says including 5 per cent commission. So that is the price would appear on the invoice that we received [sic]. Invoices are usually made out by Sassoon. [R.37.]

Several copies of invoices were presented to the witness by Government counsel but it developed that these copies were taken from the original invoices in the official papers already in evidence. Mr. Taylor further testified as follows:

Q. Now I refer you to Defendant's Exhibit B, and refer you to the same style number D206, on the invoice dated September 12, 1960, is the price there listed also as $7.50 for each dress?—A. Yes.

Q. Therefore, the invoices are in accordance with the confirmation of order from Faini?—A. Yes.

Q. In both instances has the manufacturer included Sassoon's 5 per cent commission within that $7.50?—A. Yes, it says here "5% your commission included." [R.45.]

Several other invoices from various appeals were shown to the witness and he admitted that the export prices shown on the invoices included the 5 per cent claimed as deductible from the appraised value. (R. 61 to 72 and page 5 of exhibit 1.)

A letter (defendant's exhibit E) was introduced during the cross-examination of Mr. Taylor. This letter, dated July 15, 1960, in which the salutation appears as "Dear George," admittedly a business associate of Taylor, purports to be in answer to a letter of Knit Wits for Men, written July 6, 1960. It states that new invoices are being sent as requested and further explains "You will note that on the invoices, our 5% commission has been calculated on Export Price, which the real price of each article [sic]." It is not exactly clear what this means.

During the cross-examination of Mr. Taylor the Government's collective exhibit D, a five page letter, was also introduced. This letter was directed to the witness Taylor by Selim E. Haiat under date of February 27, 1959. In this document, several items are contained which are entirely at variance with the claim of the plaintiffs under exhibit 2 that the Sassoon group was paid a 5 per cent buying commission by Taylor and his organizations. Among other things the fol-

lowing statements are contained in the letter:

Then, you have sent us YOUR sample to be reproduced: the sweater in Cotton. This is the famous 1500 dozen order which has been finally reduced to 700 dzs. while our commission on this business has been taken away on your insisting in having us "your buying agents" to support the air charges between New York and Los Angeles.

The last paragraph on the second page of the letter states:

Regarding our commission of 5% I think there is some misunderstanding. In fact we have never asked from you an extra commission of 5%. *In principle, our commission of 5% is being paid to us by our manufacturers.* Since the very beginning, I wanted to be frank and sincere with you by informing you what commission rate I was charging you, in order to help you in developing business on this market. I could have charged you 10% or 30% on some articles, the volume business might become smaller but my profit would have been just the same, with much less work, headaches, expenses, etc. to me, and without introducing you to my manufacturers. [Emphasis supplied.]

At page 3 of exhibit D, it is stated that "our commission is paid by the manufacturer, and only by the manufacturer."

The affidavit of Ezra L. Sassoon, also known as Zuri, sworn to on June 20, 1966, which is plaintiffs' exhibit 1, refers to the letter dated December 8, exhibit 2, and alleges that the oral understanding was reduced to that writing, and that the only point therein not adhered to was that which related to the invoicing of—

* * * our 5% commission on the f. o. b. prices separately from the invoice accompanying the shipment as Mr. Taylor told me he did not want to have to make out two separate letters of credit for one shipment, and he also wanted to give us more control of the various mills' production by controlling

[sic] the payments to the mills, thus making one letter of credit to us of which we would then remit the mills' portion to the mills.

Reverting now to the first primary question, supra: plaintiffs' exhibit 1, the affidavit of Ezra L. Sassoon, asserts that in a letter dated December 8, 1958 (which is plaintiffs' exhibit 2) an oral understanding between Minkap of California and all affiliated companies (Larry Taylor is president of Minkap and of Knit Wits, R.19) was reduced to that writing. Taylor (R.24, 26, 28) and said Sassoon, exhibit 1, page 2, agree that the terms were adhered to except for paragraph 6 relating to invoicing of 5 percent commission on f. o. b. basis. Exhibit 2 refers to a 5 percent commission to the Sassoon firm as *exclusive* buying agent for Italy. It provides for irrevocable letters of credit in favor of Sassoons, the latter committing themselves to pay the industry which is given the order. Taylor (R.74, 75) stated that letters of credit were issued to Sassoon which included the 5 percent commission which Sassoon retained. Taylor dealt with the individual factories while Sassoon was an agent only for 5 percent commission, and acted as interpreter and inspected the merchandise. Sassoon was "absolutely not" dealt with as the principal seller (R.73, 74).

Customs representative report dated April 12, 1961, part of defendant's collective exhibit F, asserts an interview with Leon S. Sassoon and alleges, page 2:

Mr. Sassoon said that it was agreed with Knit Wits that he would receive a commission of 5 percent of the F.O.B. packed invoice values on these shipments for transmitting the orders, inspecting the merchandise, and handling payments to the manufacturers, the commission to be included in the manufacturers' sales prices to Knit Wits.

The above report refers to some confusion as to Sassoon's status but that he was acting as buying agent. Also, that all manufacturers show the full price on the invoices and that "Payment of the

full invoice amounts is made by Knit Wits for Men to Mr. Sassoon, who deducts 5 percent from the remittance and pays the balance to the manufacturers." The report further states, page 3:

*Verification:* Mr. Sassoon produced records showing that the invoiced amounts shown on his commercial invoices and on the Special Customs invoices were paid by letters of credit and that he remitted these amounts, less 5 percent commission, to the manufacturers.

The contents of defendant's exhibit D, a letter dated February 27, 1959, addressed to Larry Taylor, by Selim B. Haiat are refuted by Ezra Sassoon who was interviewed by the customs representative on August 10, 1961. See report dated August 18, 1961, part of defendant's collective exhibit F. This report indicates that said Sassoon stated it was written at the beginning of the relationship with Knit Wits "When some costly mistakes were made, and that it should not be taken literally since its purpose was to convince the importer that he was not letting Sassoon made [sic] any money on the business" and that "Haiat did not mean that the buying agent status was false but that it was anomalous that a buying agent should have to bear expenses rather than lose a manufacturer." However, there never was any subsequent statement made by Haiat himself to the effect that any of the statements contained in exhibit D were untrue.

The above report further states that—

Mr. Sassoon said that many statements in this letter to the effect that the manufacturer pays the commission are incorrect. He said that Haiat must have meant that since the commission is deducted from the manufacturers' invoice amount it is in that sense paid by the manufacturer, but that this argument must be attributed to the polemical tone of the letter and is in any event an erroneous interpretation of the facts. He said that the manufacturer does not pay Sassoon, and that the invoices and records of

payment show clearly the nature of the commission.

The above report also refers to the 5 percent agreed commission between Knit Wits and Sassoons and a 2 percent commission from one firm, but that the balance of the Knit Wits payment is for the said firm. Apparently, Sassoon made an extra 2 percent from this one manufacturer.

Plaintiffs' exhibit 3 dated August 2, 1962, is a letter from Sassoon signed by Zuri (Sassoon) which refers to delays in shipments, efforts by Sassoons to expedite shipments by the manufacturers, and states that as Sassoon is working on a commission basis—

\* \* \* We cannot absolutely pay important amounts, for delays on which we do not have any direct responsibility. We hope that you realize the amount of work we have to do from the moment in which we receive your designs to the moment the last shipment is done. \* \* \* We are not working with you like traders with a profit permitting us to support all these charges, but we are working as your agents on a commission basis, and we cannot support any debit in any case.

■ Viewing the situation as a whole it would appear *prima facie* from the foregoing that Sassoon was a *bona fide* buying agent for Knit Wits at 5 percent commission on the invoiced export price or home price, as the case may be. Defendant's evidence does not successfully counter that conclusion.

Reverting now to the second primary question, supra: Plaintiffs' collective exhibit 4 consists of two official "Notice[s] of Action—Increase in Duties" sent by the examiner to Knit Wits, both dated November 17, 1964. One notice states that "All entries from July 18, 1960 until August 17, 1960 to wit: entries Nos. 2943, 3954, 4271, 4272, 5147, 6001 and 8308 from shipper Leon S. Sassoon of Italy are appraised at export value, net, packed. 'Buying Commission' considered part of appraised value." The other

notice states that "All entries dated from August 9, 1960 until August 7, 1963 from shipper Leon S. Sassoon of Italy, are appraised at export value, net, packed. 'Buying Commission' considered part of appraised value." These notices take in all cases before the court, the exportations having been made from July 1960 to August 1963.

Defendant's counsel brought out the fact that several of the manufacturers' invoices and the special customs invoices agree that the invoiced export prices include the 5 percent commission. It was standard procedure to take the unit invoice price and divide it by 95 (which is 100 percent less 5 percent commission) and arrive at the export price. When 5 percent of the export price is deducted it results in the invoice unit price. (See R. 61 to 72 and page 5 of exhibit 1.)

From the foregoing, it seems clear that the invoiced 5 percent commission *is* included in the invoiced export prices or home prices, as the case may be, which prices were adopted by the appraiser as his appraised values. This is further supported by some of the evidence referred to supra as to the *first question,* as well as by the invoiced statements as to export prices or home prices, as the case may be.

Accordingly, both questions should be answered in the affirmative, and the applicable law must, therefore, be applied thereto.

■ Counsel for the plaintiffs, quoting from the case of Lollytogs, Ltd. v. United States, 55 Cust.Ct. 608, Reap. Dec. 11073, correctly sets forth the law applicable to buying commissions in reappraisement cases as follows:

It has long been settled law that a *bona fide* buying commissioin, one which inures to the benefit of the purchaser, not the seller, is no part of the value of imported merchandise. Stein v. United States, 1 Ct.Cust.Appls. 36, T.D. 31007; United States v. Case & Co., Inc., 13 Ct.Cust.Appls. 122, T.D. 40958; United States v. Dan Brechner et al., 38 Cust.Ct. 719, A.R.D. 71,

■ However, the law is just as well settled to the effect that the plaintiff has the burden of establishing the fact that an amount claimed nondutiable as a buying commission is in fact a *bona fide* buying commission. As stated by the defendant in quoting from Haddad & Sons, Inc. v. United States, 53 Cust.Ct. 423, 425, R.D. 10825; *"Bona fide* buying commissions do not constitute part of the value of merchandise for appraisement purposes. United States v. Nelson Bead Co., 42 CCPA 175, C.A.D. 590; United States v. Gitkin Co., 46 Cust.Ct. 788, A.R.D. 132. Whether a buying commission is *bona fide* depends upon the facts in each case."

■ In the case at bar, it appears supra, that the Sassoon group was acting on behalf of plaintiffs as their buying agent at 5 percent commission on the f. o. b. Milano export price or home price, as the case may be; thus, said commission is "a *bona fide* buying commission, one which inures to the benefit of the purchaser, not the seller" and "is no part of the value of imported merchandise." Lollytogs, Ltd. v. United States, supra. On the facts in this case, the said commissions are *"Bona fide* buying commissions [and] do not constitute part of the value of the merchandise for appraisement purposes." Haddad & Sons, Inc. v. United States, supra.

Exhibit 1, which is the affidavit of Ezra L. Sassoon who was the "manager in charge of exports" of the Sassoon group, supports the fact of a buying agent relationship between Knit Wits and the Sassoon group. It is there stated at page 3:

That I only placed orders with the mills for the women's knitwear on instructions from Mr. Taylor's firm known as Knit Wits. These orders were prepared on behalf of Knit Wits. I always made sure that the mills understood that the purchaser in all cases was Knit Wits in California because we could not take the risk of being responsible for any refusal of the goods on the part of Knit Wits merely on a 5% commission. In addition, I

was required to inspect for quality control on behalf of Knit Wits. In addition, my firm had no agreements with any of the factories with which I placed orders for Knit Wits and received no favored prices from any of the factories. * * *

This is further supported by Mr. Taylor who testified in open Court (R.29), that—

Well, they acted as interpreter, because I do not speak Italian, and in almost every case the factories we worked with did not speak English. So either Mr. Leon Sassoon or son, Ezra, always accompanied me to the factories to act as my interpreter. They would make inspections of the merchandise before it was ready to ship, to make certain that size and quality were up to the standard of the initial samples made, and they would receive our letter of credit and make certain that the money was not paid to these factories until it was ascertained that the production and the quality of merchandise they were going to ship was as per sample.

The duties performed by the Sassoon group are those which are usually performed by persons or firms working for American buyers on a commission basis. Note Stein v. United States, 1 Ct.Cust. Appls. 36, T.D. 31007; United States v. Case & Co., Inc., 13 Ct.Cust.Appls. 122, T.D. 40958; Shalom & Co. v. United States, 56 Cust.Ct. 625, Reap. Dec. 11141. In the *Shalom & Co.* case, supra, the court stated, page 629:

We believe that the record amply establishes, as a fact, that the commission shown on the invoice as 5 percent is a *bona fide* buying commission, "pure and simple, and in no wise entered into the actual market value of the goods. It is therefore a nondutiable item" as stated by the court in Stein v. United States, 1 Ct.Cust. Appls. 36, T.D. 31007.

The foregoing is applicable to the overall facts in the case at bar, though some evidence appears somewhat confusing or contradictory.

In accordance with the foregoing, the court makes the following findings of fact:

1.  The merchandise involved in the pending 191 reappraisement appeals consists of wool knitwear for women produced by a number of different manufacturers in Italy, which was exported therefrom during the period from July 1960 to August 1963.

2.  It was stipulated by counsel, and the court finds, that the proper basis for appraisement of the merchandise at bar is export value as defined in section 402 (b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165, and that said merchandise does not appear on the final list, 93 Treas. Dec. 14, T.D. 54521.

3.  The evidence in this case discloses that the importer paid to Leon S. Sassoon, also referred to as the Sassoon group, a *bona fide* buying commission of 5 percent upon the invoiced f. o. b. Milano "export prices" and upon the invoiced "home" prices, as the case may be, which prices were adopted by the appraiser in his appraisements.

As conclusions of law from the foregoing facts the court finds:

1.  That export value, as above defined, is the proper basis for appraisement of the involved imported merchandise.

2.  That Leon S. Sassoon, also referred to as the Sassoon group, was a *bona fide* buying agent for the importer and received 5 percent buying commission on the invoiced f. o. b. Milano "export prices" and upon the invoiced "home" prices, as the case may be.

3.  That said 5 percent buying commission inures to the benefit of the purchaser, not the seller, and is not a part of the value of the imported merchandise.

4.  That the appraiser erroneously included the said 5 percent buying commission as part of the appraised values.

5.  That said export value is the appraised value less 5 percent buying com-

mission erroneously included therein for each item in each of the 191 reappraisement appeals herein.

Judgment will be entered accordingly.