**J. C. PENNEY PURCHASING CORPORATION et al.**

v.

**UNITED STATES.**

**C.D. 4741, Court Nos. R67/3007, etc.**

United States Customs Court.

May 8, 1978.

John B. Pellegrini and Joseph R. Krajci, New York City, for plaintiffs.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C. (Saul Davis, New York City, trial atty.), for defendant.

MALETZ, Judge:

These 58 consolidated appeals for reappraisement involve the proper dutiable value of various merchandise imported from Hong Kong and Japan during the period 1965 through 1970. The merchandise was entered at the ports of Seattle, San Francisco, Los Angeles, and Norfolk by J. C. Penney Company, Inc. (hereinafter Penney) or J. C. Penney Purchasing Corporation[1] (hereinafter Purchasing). The basis of appraisement is not in issue since it is agreed that export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. 1401a), is the proper basis for appraisement. The parties also agree that each of the appraisements is separable and plaintiffs rely upon the presumption of correctness as to all elements of value ex-

1. Purchasing is a wholly owned subsidiary of Penney, and its primary purpose is to import Penney's merchandise bought overseas.

2. Although some of the complaints in these actions contest the dutiability of certain inland charges, plaintiffs have abandoned all claims relative to the dutiability of such charges.

3. Plaintiffs' three witnesses were: (1) Robert Boulogne, the manager of the international buying department of Penney, who during the

975

cept the alleged buying commissions.[2] Thus, the parties agree that the sole issue presented is whether certain charges listed on the invoices encompassed by the entry papers as "buying commissions" or "handling commissions" are properly included as part of the dutiable export value of the imported merchandise. Stated otherwise, the sole issue is whether a Japanese company, known as the Sanyei Corporation (hereinafter referred to as Sanyei), was a bona fide buying agent of Purchasing and whether the amounts paid to it by Purchasing were buying commissions.

### The Statute

Section 402(b) of the Tariff Act of 1930, as amended (19 U.S.C. 1401(a), reads as follows:

(b) *Export Value.*—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

### The Record

We consider first the record which consists of the testimony of three witnesses on behalf of the plaintiffs[3] and five exhibits

latter part of 1964 through mid-1968 was the manager of Penney's Far East buying operations and was also vice president of Purchasing; (2) George Koegler, Penney's import-export manager for operations; and (3) T. Mizoguchi, vice president of United States and Canadian operations and president of Sanyei, New York. Further, based on the weight of the credible evidence, it is found that Mr. Mizoguchi was director of Sanyei's Osaka office in Japan from 1966 to 1970.

also introduced by plaintiffs. Defendant presented no witnesses but introduced five exhibits. The official papers were received in evidence as unmarked exhibits.

In the circumstances of the present case, the record is best understood by summarizing the testimony of the witnesses.

### Testimony of Robert Boulogne

Plaintiffs' first witness, Robert Boulogne, testified that from the latter part of 1964 through mid-1968 he was the manager of Penney's Far East buying operations, which operations had offices in Osaka, Tokyo and Hong Kong. He stated that in this capacity he was responsible for furnishing market information to Penney's central buyers and for providing full buying services and assistance in connection with Penney's purchases in the Far East.

Continuing, Mr. Boulogne testified to the following effect:

Purchasing was a wholly owned subsidiary of Penney and was established for the primary purpose of directly importing merchandise from overseas. The buyers employed by Penney purchased both domestic and imported merchandise; however, when these buyers purchased imports on a direct basis, they did so by instructing Purchasing as to what to buy, whereupon Purchasing entered into buying contracts with suppliers. As a result of this arrangement, the merchandise thus purchased was owned by Purchasing until such time as it was landed in the United States when Purchasing then sold it to Penney and title passed from Purchasing to Penney. Purchasing did not make a profit on its sales to Penney and therefore Penney paid the amount shown on the invoice.

Purchasing had a staff in the Far East which, in addition to Mr. Boulogne, consisted of approximately 12 people in Osaka, seven or eight people in Tokyo, and three to five people in Hong Kong. These employees were known as market representatives, and each of them was assigned a commodity and a territory. The market representatives were foreign nationals who could speak English and act as translators for buyers. As a further part of their duties, they handled correspondence for the merchandise within their respective areas of responsibility; conducted inspections in order to ensure that merchandise conformed to specifications; and researched the market in an attempt to discover which products in their respective areas were suitable for Penney's buyers. In fact, if a Penney buyer wanted to purchase directly from a manufacturer, it was done through Purchasing's market representatives.

Although Purchasing performed the same functions as a buying agent, its staff and facilities were not adequate to cope with the large volume of business Penney conducted in the Far Eastern area. Thus, in order to provide the necessary buying services in that marketplace for "sundry" merchandise such as that involved here (i. e., merchandise comprised of small items manufactured, in some instances, by small, difficult to reach factories), Purchasing would have needed a staff of 150 people and would have had to expand its facilities. Purchasing, however, desired to maintain flexibility in its Far Eastern operations, and to that end it did not expand but rather chose to keep its staff small and its overhead low. In light of this policy, Purchasing needed a buying agent to handle its volume and therefore entered into agency agreements with Sanyei to provide the necessary buying services, particularly for "sundry" merchandise, in Tokyo, Osaka, and Nagoya, Japan, as well as in Hong Kong. In this connection, one large manufacturer of sundry merchandise attempted to sell Penney on a direct basis, but Penney chose not to do so because it felt it didn't have the personnel and facilities to perform the services Sanyei provided.

The first "Agency Agreement" between Purchasing and Sanyei was dated June 26, 1963 and was entered into by Purchasing and Sanyei's Hong Kong office, while the second, dated July 6, 1964, was entered into by Purchasing and Sanyei's Tokyo office.

The language of the two agreements was identical and the agreements in their entirety provided as follows:

This is to confirm our arrangements made with you whereby you agreed to purchase merchandise for our account, as specified in our orders and contracts forwarded &/or to be forwarded to you. Upon receipt of our orders and contracts you will purchase merchandise for our account for which service we will pay you varying percentages of buying commission depending on the merchandise bought and the maximum commission will be 5%. If purchased from vendors who usually quote on an "ex-factory" basis the commission will be based on the "ex-factory" price—or if purchased from vendors who usually quote on an "F.O.B." basis, the commission will be based on the "F.O.B." price. The names of the manufacturers for each items [sic] invoiced must also appear on the invoices.

A third "Agency Agreement," dated August 13, 1969, was entered into by Purchasing and Sanyei's Osaka office and superseded the first two agreements. This third agreement was in the form of a letter from Purchasing to Sanyei which was agreed to by Sanyei and read as follows:

This letter designates you as one of our buying agents.

This agency agreement is non-exclusive. The relationship between you and us is subject to the terms and conditions set forth below and in each of our import contracts placed with you.

1. You shall perform for us the following services:

(a) You will actively investigate buying possibilities which might be of interest to this Company both on your own initiative and as requested by us.

(b) You will purchase and forward to our Far East offices or our United States buyers samples of merchandise as requested by our Far East offices or our United States buyers.

(c) We will send you import contracts for merchandise we desire to purchase. You will purchase the merchandise described in the contract at the cost as stated in the contract, and will charge to us a commission equal to the percentage of the rate stated in the contract. You will purchase the merchandise described in the contract from the supplier designated in the contract, and the name/s of the manufacturer/s of each item must appear on such invoice/s. You agree to indemnify and hold us harmless against and from all claims of suppliers.

(d) All merchandise purchased by us under contract with you as aforesaid shall first be inspected and approved by you before being shipped to us, and our letters of credit or other methods of payment will be subject to your approval as a condition of payment. You agree that your approval will be granted only if such merchandise (i) conforms to our specifications as set forth in the applicable contract (and all amendments thereto) and is not defective in any respect, (ii) meets the requirements of all U.S. Government laws and regulations as specified in the applicable contract, (iii) is packaged, labeled, priced and invoiced in accordance with the instructions set forth in the applicable contract, and (iv) is packaged in a manner which will insure its safe transportation to this Company's stores or warehouses.

(e) In the case of claims of this Company resulting from defective or rejected merchandise (including, but without limitation, defects discovered after receipt and resale by J. C. Penney Company), you will reimburse us for such defective or rejected merchandise.

(f) Should we send to you labels and tags for use by the supplier, it

is understood that you will be billed and you in turn will obtain payment for us from the supplier for such labels and tags. In the event you fail to obtain such payment from the suppliers, you shall be directly liable to us for the amount of such payment at the billing price. (g) You agree that you will work only with reputable suppliers with sound credit ratings, who are capable of meeting the terms of their contracts. If we shall so request, you will supply us with credit reports and other information concerning suppliers with whom you are, or may be, dealing on our behalf.

2. In consideration of the performance by you of services as one of our buying agents, we agree to pay you the commission at the rate set forth in the import contracts placed with you. The commissions shall not exceed 5% of the supplier's ex-factory (or f. o. b. shipping point) selling price unless otherwise specially agreed by you and us. The commission specified in the import contracts shall represent your entire compensation for work performed on our behalf and you shall not be entitled to any further compensation or reimbursement except that you shall receive reimbursement for the cost of samples forwarded to us pursuant to 1(b) above and related shipping costs.

3. It is understood that you are an independent contractor and that the arrangement between us does not constitute a partnership or employee relationship. No contract for the purchase of merchandise by this Company shall become effective unless signed by a person authorized to sign in the name of the Company and by our appropriate U.S. buyer. No agreement or commitment made on our behalf is binding on us without a confirmation by cable or other writing by a person authorized to act in the name of the Company.

4. The purchase price of all merchandise contracted for will be stated in United States dollars. Our sole responsibility shall be to pay for such merchandise the amount in United States dollars set forth in our contract.

5. This agreement may be terminated by either party at any time by giving the other party prior written notice of the effective date of termination.

6. Upon termination of this agreement, (a) all right and obligations of the parties hereto shall cease and terminate except as to rights and obligations accrued prior to the date of such termination, including rights and obligations under outstanding import contracts not yet performed (b) we shall have the right to deal with all suppliers used by you in connection with business for us either directly or through one or more other buying agents without further obligations to you, and (c) you shall turn over to us any and all copies of contracts and other information in your files relating to arrangements made by you with suppliers of merchandise to us (it being understood that all such contracts and other information shall be treated by you as confidential and shall not be disclosed by you to any third party either during or after the term hereof).

7. This agreement supersedes all previous arrangements between us.

8. This agreement has been executed in accordance with, and shall be governed by, the laws of the State of New York, United States of America.

If the foregoing terms and conditions are satisfactory to you, please sign and return to us the enclosed copy of this letter, whereupon this letter shall constitute a binding

agreement between us effective as of the date of this letter.

Against this background, the normal purchasing situation was initiated by the Penney buyer apprising Purchasing of the type of merchandise he was seeking. Purchasing then advised Sanyei of the specified merchandise and Sanyei in turn researched the market, contacted manufacturers, and obtained samples in preparation for the buyer's visit.

The samples obtained by Sanyei were displayed to the buyer in Sanyei's showroom (which in Osaka was about 40 feet by 60 feet) where the price of the merchandise was usually marked on the samples and Sanyei would then give the buyer various estimates of costs above the price marked on the samples, which costs included inland charges, storage charges, lighterage, etc. This enabled the buyer to have an estimate of the f. o. b. price of the article. On the buyer's first visitation, Sanyei's showroom would collect a fairly large selection of samples for the Penney buyer to give him an idea of what was available in the market. However, Sanyei did not display a full line of merchandise or, at any given time, have samples for every type of article. Nor did Sanyei maintain an inventory. As the buyer got the feel of merchandise, he would become more specific as to which manufacturers to go to and what areas and groupings of merchandise he would want to see.

In the usual situation, the buyer would first go to Sanyei's showroom and then proceed to the factory with representatives from both Sanyei and Purchasing. About 20%–30% of a buyer's time was spent at Sanyei and 70% at factories.[4] Substantial negotiations took place at the factory, but in the main, the finalization of these negotiations was conducted in Sanyei's offices where the Penney buyer made a final review of the merchandise submitted by the manufacturer. A price would be decided upon, and a firm decision to purchase a particular commodity would be made.

When this occurred, Purchasing would enter into a contract for the particular merchandise, indicating a specific quantity and delivery date. These contracts were between Purchasing and Sanyei and were signed by one of Purchasing's officials. Each contract contained, in the lower right-hand corner, a heading which stated "We accept and agree to fill this order as per terms and conditions of above contract," which was signed by the party to whom "the contract is made out to." In the present cases, the party is Sanyei. Neither Purchasing nor Penney signed any contracts for the sale of this merchandise with the manufacturers of the merchandise. The witness assumed that title passed from Sanyei to Purchasing and not from the suppliers to Purchasing.

In some contracts between Purchasing and Sanyei, the name of the manufacturer was not specified, while in other contracts the name of the manufacturer was specified. However, Purchasing's market representatives had the responsibility of insuring that the factory designated by the Penney buyer produced the merchandise. Thus, after the Penney buyer specified a particular manufacturer, a market representative of Purchasing almost always followed up by making sure that Sanyei obtained the merchandise from that manufacturer.

The manufacturers would have had to know that merchandise was destined for Penney because a great deal of the merchandise had Penney identification labels. This they would also have known from buyer visitations and Penney carton markings.

Upon receipt of the contract, Sanyei would issue an order to the manufacturer on behalf of Purchasing and would service the contracts, inspect the merchandise at the factory, take care of the documentation, mark the shipments and transmit further instructions which Purchasing gave to Sanyei, such as changes in packaging specifications. Sanyei would arrange for the shipment of the merchandise from the factory

---

4. In a previous deposition, Mr. Boulogne testified that a Penney handbag buyer would spend only about 30% of his time at the factory.

to Sanyei's warehouse or to the port of debarkation. Penney never paid for merchandise before it was aboard the vessel. The merchandise was insured, and if it was lost before it was laden aboard the vessel, Sanyei would process the insurance claim for Purchasing. If there was nonconforming merchandise, Sanyei would obtain restitution from the manufacturer and a cash payment was drawn against Sanyei. In such situations, Purchasing was never compensated by the manufacturer directly.

Purchasing's payment for merchandise was effected through letters of credit drawn to Sanyei. Upon presentation of the proper documentation which included invoices of Sanyei covering the merchandise in question and specified documents including certificates of inspection, the bank would make payment to Sanyei against Purchasing's letter of credit. It was not necessary for Sanyei to present the invoices from the actual manufacturers nor the receipts for transportation charges from the Sanyei warehouses to the ship in order to collect on Purchasing's letters of credit. Receipts from the transportation companies were not needed by Purchasing because Purchasing purchased f. o. b.

In the event a manufacturer could not produce a certain product, Sanyei could not use another manufacturer without Purchasing's authority to do so for the reason that qualities between manufacturers varied. Such authority by Purchasing was necessary even if a substitute product was of equal price and equal quality and notwithstanding that it would make no difference to Penney as to who manufactured the article.

Purchasing paid Sanyei a buying commission of 5% of the ex-factory price.[5] There was no separate charge for the inspection services which Sanyei performed for Purchasing; instead, compensation for such inspection services (which Sanyei always performed on each shipment for Purchasing) was included in the 5% commission. Sanyei was required to present a certificate of inspection with the document package provided to Purchasing, certifying that Sanyei had inspected the goods to ensure that the goods conformed to Purchasing's specifications. This certificate was required before Sanyei could receive payment through the letter of credit.

### Testimony of T. Mizoguchi[6]

Mr. Mizoguchi, who was director of Sanyei's Osaka office from 1966 to 1970 (see note 3, *supra* ), testified to the following effect:

During the above period, Purchasing would advise Sanyei that it was interested in certain items specifying the price range, color, size and other details. Sanyei would obtain samples meeting these requirements and make all the necessary preparations for the purchase of these items. Frequently, marketing representatives from Purchasing would work in conjunction with Sanyei in negotiating price and arranging for the manufacture of these articles. These negotiations and arrangements would take place either at Sanyei's showrooms or at the manufacturer's factory.

Sanyei would do nothing until it received a contract of purchase and a letter of credit from Purchasing at which time Sanyei would place the order. Before the manufacturer completed the order, Sanyei personnel would inspect the goods against the sample at the factory; in some instances, Purchasing market representatives would accompany them on these inspections. If the goods were satisfactory the manufacturer would then ship them to the Sanyei

---

5. Initially, Mr. Boulogne testified that a 5% commission was always paid (R. 27–28). Later he modified this and testified that in 99% of the instances he recalled a 5% commission was paid (R. 76–77). More specifically, the official papers indicate that the 58 entries here involved cover 65 orders. Of these 65 orders, the official papers show that a commission of 5% was paid on 60 orders; a commission of 3% was paid on two orders; and a commission of 2% was paid on three orders. See Appendix A of defendant's brief.

6. Plaintiffs' third witness, George Koegler, was called for the sole purpose of identifying the Hong Kong "Agency Agreement."

warehouse. During this time if the goods were destroyed or lost, the responsibility for the loss was on the manufacturer.

When the merchandise reached the warehouse, Sanyei would ask Purchasing to inspect the goods and would receive further shipping instructions. In situations where the manufacturer could not fill an order or the manufacturer stated it could not meet the negotiated price, Sanyei would always request further instructions from Purchasing before taking any further action.

Sanyei never received compensation from, never invested money with, nor did it ever share its commissions with any of the manufacturers supplying Penney. Furthermore, the manufacturers' invoice prices were the same prices Sanyei invoiced Penney for the merchandise.

Sanyei was paid by a letter of credit issued by Purchasing and it would borrow money against these letters of credit. Sanyei paid the manufacturer 70% to 80% of the full amount of the letter of credit and paid the balance due after shipment was made to Purchasing.

Sanyei insured the merchandise, and if goods were lost after leaving the factory and before reaching the Sanyei warehouse, Sanyei would negotiate the claim with the insurance company on behalf of Purchasing. If goods were defective or nonconforming, Sanyei settled the claim in accordance with the Penney buyer's instructions.

Sanyei had showrooms in Osaka, Tokyo and Nagoya which never maintained an inventory. However, these showrooms had samples of a full line of merchandise.

Sanyei's commissions from Purchasing were always 5% of the ex-factory price;[7] in addition to these charges, there were shipping charges, storage insurance, inland charges, miscellaneous charges, and inspection fees.[8]

There were instances where Sanyei would borrow against Purchasing's letters of credit to advance manufacturers money to buy materials. Purchasing usually issued the letters of credit two to three months before shipment and the banks would loan Sanyei money against these letters of credit as soon as they were issued. It was not necessary for Sanyei to produce bills of lading to show the merchandise was on board a vessel in order to borrow against these letters of credit; however, Sanyei could not collect on the letters of credit until the merchandise was on the ship. Purchasing knew that Sanyei was borrowing against the letters of credit but never gave Sanyei express permission to do so and, therefore, Sanyei was responsible for these loans. During the period in question, there was no instance where a manufacturer who was advanced money to buy materials did not deliver the merchandise.

After the merchandise was manufactured, Sanyei made provisions for shipping in accordance with Purchasing's instructions. If the merchandise was lost between the factory and Sanyei's warehouse, the manufacturer bore the loss and thus collected the insurance. On the other hand, if merchandise was destroyed in the Sanyei warehouse or lost or destroyed between the warehouse and the pier, the insurance would be collected by Sanyei on behalf of Purchasing and paid to Purchasing.

Sanyei was paid by Purchasing when the merchandise was on the vessel and Sanyei presented a bill of lading to the bank. Sa-

---

7. See note 5, *supra*.

8. Mr. Mizoguchi's testimony that Sanyei's inspection fee was an additional charge over and above the 5% commission is in direct conflict with Mr. Boulogne's testimony that the 5% commission *included* the inspection fee. It is also in direct conflict with the third "Agency Agreement," *supra*, which provided that the commission not to exceed 5% shall represent Sanyei's *entire* compensation for work performed on Purchasing's behalf. See par. 2.

The agreement further specified that included in the work Sanyei was required to perform on Purchasing's behalf was the *inspection* and approval of all merchandise purchased by Purchasing before shipment. See par. 1(d). Considering these provisions of the agency agreement and Mr. Boulogne's testimony, it must be concluded that Mr. Mizoguchi's testimony on this score was in error and that compensation for Sanyei's inspection services was included in the 5% commission.

nyei paid the insurance premiums in advance as the agent of Purchasing and was reimbursed for such premiums as well as its 5% buying commission and other charges advanced on behalf of Penney when it presented its bill of lading quoting f. o. b. prices on the merchandise to the bank holding the letter of credit.

As far as the manufacturer was concerned, his responsibility for the merchandise ended when he left the goods at Sanyei's warehouse. At that time, Purchasing owned the goods because Sanyei had a letter of credit for the goods and purchased them for Purchasing as its agent.

Manufacturers in Japan would sell to buyers directly. Therefore, Purchasing could have but chose not to buy goods directly from any of the manufacturers here involved because it did not have sufficient facilities to export these goods from Japan to the United States, and it was for that reason Purchasing utilized Sanyei's buying services.[9]

### The Law

■ Turning now to the law, it is basic that the values found by the government are presumptively correct and that the plaintiffs have the burden of proving first that the appraised values are erroneous and second that the plaintiffs' claimed values are correct. However, where, as here, plaintiffs challenge but one of the elements entering into the appraisements under scrutiny and since it is agreed that the appraisements are separable, plaintiffs can rely upon the statutory presumption of correctness as to all other elements of value. E. g., *United States v. Imperial Products, Inc.*, 570 F.2d 337, 65 CCPA ——, C.A.D. 1203 (1978); *United States v. Bud Berman*

*Sportswear, Inc.*, 55 CCPA 28, C.A.D. 929 (1967); *United States v. H. M. Young Associates*, 505 F.2d 721, 62 CCPA 20, C.A.D. 1138 (1974). Thus, plaintiffs' exclusive burden is to establish that the commissions paid Sanyei were bona fide buying commissions. In defendant's words (Br. p. 25):

* * * where an export value appraisement is made upon the basis of an ex-factory amount plus certain inland charges and an alleged buying commission, and the plaintiff claims that the exfactory amount represents the proper export value, the plaintiff must prove that the buying agency was a true, *bona fide* principal-agent relationship. *B & W Wholesale Co., Inc. v. United States*, 58 CCPA 92, C.A.D. 1010, 436 F.2d 1399 (1971); *Park Avenue Imports v. United States*, 62 Cust.Ct. 1035, A.R.D. 255 (1969).

The appraisement in this case appears in the traditional, separable form. Thus, plaintiff, in order to establish a *prima facie* case and discharge its dual burden of proof, need only prove the nondutiable character of the alleged buying commission. Its proof, however, must be by a preponderance of the credible evidence. *Globemaster Midwest, Inc. v. United States*, 67 Cust.Ct. 539, 547, R.D. 11758 (1971).

■ It is, of course, fundamental that a bona fide buying commission is not a proper element of dutiable value. E. g., *United States v. Nelson Bead Co.*, 42 CCPA 175, C.A.D. 590 (1955); *United States v. S. S. Kresge Co. et al.*, 26 CCPA 349, C.A.D. 39 (1939); *Knit Wits (Wiley) et al. v. United States*, 59 Cust.Ct. 753, R.D. 11401, 278 F.Supp. 291 (1967), aff'd, 62 Cust.Ct. 1008, A.R.D. 251, 296 F.Supp. 949 (1969); *Carolina Mfg. Co. v. United States*, 62 Cust.Ct.

**9.** With regard to Sanyei's operation in Hong Kong, the testimony of Mr. Boulogne is that the services performed by Sanyei for Purchasing in Hong Kong were the same as those provided in Japan. This is supported by an affidavit of M. Hasegawa, director of Sanyei Corporation (Hong Kong) Ltd. (hereinafter Sanyei Hong Kong), which attests that his firm has acted as Purchasing's buying agent since 1963. In this capacity, according to the affidavit, Sanyei Hong Kong, acting on behalf of Purchasing, placed orders with various manufacturers, inspected merchandise, arranged for shipment and prepared the documentation. The affidavit further states that Sanyei does not buy for its own account for resale, but purchases for Purchasing only upon specific instructions. Finally, the affidavit declares that Sanyei Hong Kong received no remuneration whatsoever from any of Purchasing's manufacturers, nor did it in any way own or control such manufacturers during the period in question.

850, R.D. 11640 (1969). In this setting, the court concludes for the reasons that follow that the evidence of record establishes that Sanyei was plaintiffs' bona fide buying agent and that the amounts paid to Sanyei constituted compensation for the type of services normally performed by such agents. Therefore, the amounts paid to Sanyei and described on the subject invoices as commissions were improperly included in the appraised value of the merchandise at bar.

No single factor is determinative in establishing the existence of a bona fide buying agency relationship. The existence of such a relationship must be ascertained by examining all relevant factors and each case is governed by its own particular facts. However, the primary consideration in determining whether the relationship is one of agency is the right of the principal to control the agent's conduct with respect to the matters entrusted to him. *B & W Wholesale Co., Inc. v. United States*, 436 F.2d 1399, 1402, 58 CCPA 92, 95, C.A.D. 1010 (1971); *Dorf International, Inc., et al. v. United States*, 61 Cust.Ct. 604, 610, A.R.D. 245, 291 F.Supp. 690, 694 (1968); *Globemaster Midwest, Inc. v. United States*, 67 Cust.Ct. 539, 546, R.D. 11758, 337 F.Supp. 465 (1971). The evidence of record points to the fact that the activities of Sanyei with regard to the subject merchandise were at all times controlled by plaintiffs. The role of plaintiffs in the selection of the subject merchandise, including selection of the factory, was active, not passive, and Sanyei was given no discretion in the purchase of the subject merchandise.

More specifically, the services performed by Sanyei were similar to those provided by plaintiffs' Far East buying offices in other commodity areas. In general, Sanyei provided Penney buyers with market information and assisted them in direct import buying activities. While plaintiffs could have purchased the subject merchandise directly from the factories without Sanyei's intervention, plaintiffs chose to deal through Sanyei as an economy measure and to maintain flexibility. The fact that an importer

has an opportunity to purchase merchandise directly, without being required to seek the assistance of an intervening party, has been held to support the existence of an agency relationship. *United States v. Alfred Kohlberg, Inc.*, 27 CCPA 223, 227, C.A.D. 88 (1940); *United States v. Enrique Vidal Sanchez*, 15 Ct.Cust.Appls. 443, 450–51, T.D. 42642 (1928); *F. W. Woolworth Co. et al. v. United States*, 6 Cust.Ct. 729, R.D. 5094 (1941).

The record establishes that before Penney buyers traveled to Japan and Hong Kong to purchase merchandise, Sanyei was instructed to research the market and gather samples of merchandise in which the Penney buyers expressed an interest. After the general sample line gathered by Sanyei had been reviewed the buyers would choose specific items of interest. This review would be followed by factory visitations by Penney buyers accompanied by representatives of Purchasing and Sanyei. During these meetings at the factories, negotiations as to price, styling and delivery took place. The fact that the importer actually visited factories and participated in negotiations with the factory has been accorded significance by this court in finding the existence of an agency relationship. *United States v. Gitkin Co.*, 46 Cust.Ct. 788, 791, A.R.D. 132 (1961); *Hub Floral Mfg. Co. v. United States*, 60 Cust.Ct. 905, 906–7, R.D. 11544 (1968).

Another consideration is that all of the subject merchandise was purchased from the factories by Sanyei on behalf of Purchasing and that the factories were aware that plaintiffs, not Sanyei, were the purchasers of the merchandise. The fact that a factory was aware that the importer and not the intervening agent was the purchaser of merchandise has been cited by this court as evidence of a buying agency relationship between the importer and the intervening agent. *Knit Wits (Wiley) et al. v. United States, supra*, 59 Cust.Ct. at 761, 278 F.Supp. 291.

Beyond this, Sanyei placed orders for the subject merchandise with the factories only after having been instructed to do so by

plaintiffs. If a factory was unable to fill an order placed by Sanyei for plaintiffs, Sanyei had to look to plaintiffs for further instructions since Sanyei could not choose another factory without direction from plaintiffs. The fact that an intervening party can only place an order with a factory after that party has received such instructions from an importer is further evidence of the existence of a buying agency. *Knit Wits (Wiley) et al. v. United States, supra,* 59 Cust.Ct. at 761, 278 F.Supp. 291; *United States v. Supreme Merchandise Company,* 48 Cust.Ct. 714, 719, A.R.D. 145 (1962).

The record also demonstrates that Sanyei, in addition to compiling market information, gathering samples, and assisting in factory negotiations, performed services which included translation, inspection, placing purchase contracts, arranging for inland shipment, and payment for merchandise. Such services are typical of those rendered by a buying agent in procuring merchandise for his principal. *United States v. Supreme Merchandise Company, supra,* 48 Cust.Ct. at 718; *Chadwick-Miller Importers, Inc., et al. v. United States,* 66 Cust.Ct. 573, R.D. 11743 (1971); *Carolina Mfg. Co. v. United States, supra,* 62 Cust.Ct. at 853; *Reliance International Corp. v. United States,* 62 Cust.Ct. 845, 849, R.D. 11639, 305 F.Supp. 20, 24 (1969).

This court in *Chadwick-Miller Importers, Inc., et al. v. United States, supra,* 66 Cust.Ct. at 578, in discussing an importer's testimony with respect to the tasks performed by his buying agent stated:

> * * * their services in seeking out for him manufacturers of the kinds of goods he wished to order and in negotiating price and other terms with sellers, their attention to shipping, checking deliveries and the conformity of goods to samples, and other such services, shows a relationship such as has been presented to the court in many cases where United States buyers are confronted, notably in Japan and in Hong Kong, with many small manufacturers. It is a relation founded on the necessity of having one's own representative to speak for the buyer in such

a foreign market. In customs jurisprudence these representatives are known as buying agents.

These are the same services performed by Sanyei and the reasons for engaging an agent are the same as those in the present case.

■ The record shows also that Sanyei had no financial interest in any of the manufacturers of the subject merchandise; that Sanyei was compensated for its services solely through a commission paid by plaintiffs; that Sanyei received no compensation or payment from the factories; and that Sanyei did not share commissions with factories. An important mark of a buying agency is the fact that none of the commission inures to the benefit of the manufacturer. *Carolina Mfg. Co. v. United States, supra,* 62 Cust.Ct. at 854. As the court stated in *Reliance International Corp. v. United States, supra,* 62 Cust.Ct. at 849, 305 F.Supp. at 24:

> Commissions paid by the purchaser to agents for services rendered in procuring the merchandise, inspecting and packing goods, arranging for shipment and acting as a paymaster for account of the buyer, *no part of which commissions inure to the benefit of the seller,* are buying commissions. *United States v. Nelson Bead Co., supra; United States v. Gitkin Co.,* 46 Cust.Ct. 788, A.R.D. 132; *Lollytogs, Ltd. v. United States,* 55 Cust.Ct. 608, Reap. Dec. 11073; *United States v. Supreme Merchandise, supra.* [Emphasis added.]

■ An affidavit by the director of Sanyei Hong Kong (see note 8, *supra*) is further proof that the relationship between plaintiffs and Sanyei was a buying agency. The affidavit affirms that Sanyei acts as a buying agent for plaintiffs, and it emphasizes the fact that Sanyei did not buy for its own account but for plaintiffs' account, and only upon specific instructions from plaintiffs. An affidavit by a party attesting to its status as a buying agent has evidentiary weight in determining a buying agency question. *Dorco Imports v. United States,* 67 Cust.Ct. 503, 512, R.D. 11753 (1971); *Vicki Enterprises, Inc., et al. v. United*

*States,* 67 Cust.Ct. 480, 487, R.D. 11750 (1971), *aff'd,* 68 Cust.Ct. 324, A.R.D. 302, 343 F.Supp. 1381 (1972), *aff'd,* 496 F.2d 1403, 61 CCPA 75, C.A.D. 1125 (1974).

The existence of a buying agency is also indicated by the "Agency Agreements" quoted before. These agreements tend to prove that Sanyei's role was one of agency. In this connection, the existence of a buying agency agreement has been cited by this court as supporting a buying agency relationship, particularly in the absence of any testimony by defendant. *Dorco Imports v. United States, supra,* 67 Cust.Ct. at 512.

Defendant insists, however, that there was not a bona fide buying agency relationship between plaintiffs and Sanyei because, among other things, (1) the merchandise at bar was sold on an f. o. b. basis, and (2) Sanyei's commissions were an integral part of the f. o. b. prices and as such a proper element of dutiable value.

█ As to the first of these contentions, it is quite true that the subject merchandise was purchased on an f. o. b. basis. But the record is clear (1) that these f. o. b. prices were arrived at on the basis of the *invoiced ex-factory prices* with charges added for inland freight, insurance, lighterage and buying commissions, and (2) that the total of these charges made up the f. o. b. prices. This is reflected in the government appraisement itself which was made at the invoiced *ex-factory prices* plus the additional charges, including buying commissions. Since the appraisement is concededly separable, plaintiffs may rely on the presumption that the merchandise was *sold* at *ex-factory prices plus* the additional charges and that these ex-factory prices were the freely offered prices. See e. g., *United States v. Imperial Products, Inc.,* 570 F.2d 337, 65 CCPA ——, C.A.D. 1203 (1978). And it is to be added that in situations virtually identical to those here—where invoices were made out on the basis of ex-factory prices plus specified charges, and f. o. b.

Japanese port prices were quoted—bona fide buying commissions were held to exist. See, e. g., *Reliance International Corp. v. United States, supra,* 62 Cust.Ct. at 847, 305 F.Supp. 20; *Carolina Mfg. Co. v. United States, supra,* 62 Cust.Ct. at 852; *United States v. Knit Wits (Wiley) et al.,* 62 Cust.Ct. 1008, A.R.D. 251, 296 F.Supp. 949 (1969).[10] See also *Mitsui & Co. (U.S.A.), Inc. v. United States,* 66 Cust.Ct. 553, R.D. 11740 (1971).

We come now to defendant's second contention that Sanyei's commissions were an integral part of the f. o. b. prices and as such a proper element of dutiable value. The basic premise of this argument is that plaintiffs could not have purchased the subject merchandise without paying a commission to Sanyei. Thus proposition is central to the decisions which follow that are cited by defendant in support of its argument. Thus defendant places heavy reliance on *United States v. Erb & Gray Scientific, Inc.,* 54 Cust.Ct. 791, A.R.D. 186 (1965), *aff'd,* 53 CCPA 46, C.A.D. 875 (1966). But in *Erb* the court found that the importer could *not* have purchased the merchandise there involved (i. e., electron microscopes) without paying certain installation and maintenance fees for the services of Japanese engineers trained by the manufacturer since such fees were necessary to make the imported microscopes operational. Accordingly, the court held that such fees were dutiable. 54 Cust.Ct. at 795, 53 CCPA at 51–52. In *Albert Mottola v. United States,* 46 CCPA 17, C.A.D. 689 (1958)—which defendant also relies on—the court based its decision on the finding that the subject merchandise could not have been purchased at a price which did not include the inland freight charges. 46 CCPA at 19. The same is true of *United States v. Paul A. Straub & Co., Inc.,* 41 CCPA 209, C.A.D. 553 (1954), *cert. denied,* 348 U.S. 823, 75 S.Ct. 37, 99 L.Ed. 649 (1954), which defendant further cites. And in another case cited by defendant— *BBR Prestressed Tanks, Inc., et al. v. Unit-*

---

**10.** The obvious reason why the subject merchandise was purchased on an f. o. b. basis was to enable the plaintiffs to know the total cost of the merchandise which they were purchasing and thus issue a letter of credit sufficient to cover such costs. See, e. g., *Lollytogs, Ltd. v. United States,* 55 Cust.Ct. 608, 611, R.D. 11073 (1965).

*ed States,* 64 Cust.Ct. 787, A.R.D. 265 (1970) —the court noted that the importer had no choice but to pay the alleged royalty fee. 64 Cust.Ct. at 790.

■ In further support of its argument, defendant refers to *International Fashions v. United States,* 545 F.2d 138, 64 CCPA ——, C.A.D. 1180 (1976), aff'g 76 Cust.Ct. 92, C.D. 4640, 408 F.Supp. 1386 (1976). While that case presents a somewhat different situation than the other cases previously cited, the case, in effect, stands for the proposition that a fee which *must* be paid by the importer is part of dutiable value. More particularly, the court in *International Fashions* held that a charge labeled as a 5% commission which was paid to the manufacturer's managing director was an expense properly includable in dutiable value since the inspection service permeated the entire manufacturing process. The court noted that if the importer desired merchandise which was quality controlled the 5% charge had to be paid and that the seller performed the inspection services. 545 F.2d at 139–40. Further, the lower court clearly distinguished the situation before it from cases involving buying commissions by pointing out that a buying commission concerns the *manner* of purchase whereas the case before it concerned the *nature* of what was purchased. In short, *International Fashions,* like the other decisions on which defendant relies, is clearly distinguishable from the present case since the evidence of record clearly establishes that here plaintiffs could have purchased the subject merchandise without the intervention of Sanyei and without paying the commission. Thus the commissions here in issue were not an integral part of the f. o. b. price.

Defendant next argues that Sanyei acted as the seller in the transaction at bar, not as plaintiffs' agent. An important element of this argument is that Sanyei assumed title to the subject merchandise and paid the manufacturer for the merchandise and, therefore, cannot be considered as plaintiffs' agent but must be considered as the seller. With respect to this argument, the record is not clear as to whether or not Sanyei obtained title to the merchandise. On the one hand, Mr. Boulogne testified that he was assuming that title passed from Sanyei to Purchasing and not from the suppliers to Purchasing. On the other hand, Mr. Mizoguchi testified that when the manufacturer transferred the goods to Sanyei's warehouse Purchasing owned the goods because Sanyei had a letter of credit for the goods and purchased them for Purchasing as its agent. In addition, the record indicates (1) that if the merchandise was lost between the factory and Sanyei's warehouse, the manufacturer bore the risk of loss and collected the insurance; and (2) that if the merchandise was destroyed in the Sanyei warehouse or lost or destroyed between the warehouse and the pier, the insurance would be collected by Sanyei on behalf of Purchasing and paid to Purchasing. In this circumstance, it would appear that Sanyei at no time had an insurable interest or bore the risk of loss which factors would tend to indicate that title passed directly from the manufacturer to Purchasing and not to Sanyei.

■ However, it is not necessary to determine whether or not title passed to Sanyei for even assuming *arguendo* that it did, "[t]he assumption of title" (as defendant observes, surreply brief, p. 7) "is only one factor in determining agency and the question of whether one is an agent must be determined from the total factual context." Thus in *Mitsui & Co. (U.S.A.), Inc. v. United States, supra,* 66 Cust.Ct. 553, the court held that the fact that an alleged buying agent took title to the goods did not preclude the court from finding that a bona fide buying agency existed. See also, e. g., *Windsor Steel Products v. Whizzer Industries,* 157 F.Supp. 284 (E.D.Mich.1957), aff'd, 261 F.2d 837 (6th Cir. 1958). And in the total factual context here, the record is clear, as previously discussed, that the activities of Sanyei with regard to the sale of the subject merchandise were at all times controlled by plaintiffs.[11]

11. It is to be noted that when an agent purchases goods for his principal and for a commission, even though the agent pays the purchase price and accepts delivery, and then re-

Additionally, defendant contends that Sanyei was not an agent because plaintiffs assertedly did not have the right to control the means through which Sanyei acted. Plaintiffs are stated to be interested solely in the results. Defendant cites Mr. Boulogne's testimony in support of this contention. The specific testimony relied upon is apparently the statement that assuming all manufacturers produced goods of equal quality and equal price Penny would not be concerned with the identity of the manufacturer. However, as Mr. Boulogne's testimony indicates, Penney was concerned with the identity of the manufacturer precisely because not all manufacturers produced goods of equal quality. In fact, the record shows that Sanyei could not substitute manufacturers without express authority from Purchasing.[12] Other indications that plaintiffs exercised control over Sanyei's activities in this respect appear evident from the facts that: Sanyei could do nothing until it obtained purchase orders from Purchasing; if a manufacturer could not meet the negotiated price, Sanyei would have to get further instructions before taking further action; if goods were defective Sanyei settled the claim according to Penney's instructions; and Penney's buyers and not Sanyei's personnel chose the particular manufacturer.

In additional support of its argument that Sanyei was not an agent because plaintiffs assertedly did not have the right to control the means through which Sanyei acted, defendant relies on two decisions: *B & W Wholesale Co., Inc. v. United States,* 436 F.2d 1399, 58 CCPA 92, C.A.D. 1010

(1971), *aff'd,* 63 Cust.Ct. 691, A.R.D. 262 (1969), *aff'd,* 58 Cust.Ct. 728, R.D. 11311 (1967); and *Globemaster Midwest, Inc. v. United States,* 67 Cust.Ct. 539, R.D. 11758, 337 F.Supp. 465 (1971). Both decisions are clearly distinguishable from the case at bar.

The facts in B & W Wholesale are not at all similar to those presented here. In *B & W Wholesale* the importer had no control over the alleged buying agent's choice of factories. 58 CCPA at 95. The evidence before the trial court included the fact that, in purchasing the subject merchandise, the only premises which the importer visited before placing orders were those of the alleged agent. 58 Cust.Ct. at 730.

On the other hand, the record here shows that it was plaintiffs, not Sanyei, who determined which manufacturers were to receive orders. Also, it was the general practice for plaintiffs' buyers to visit the individual manufacturers before instructing Sanyei to place orders.

Moreover, in B & W Wholesale, the importer had reason to believe that the inland charges were excessive, but it still did not ask the alleged buying agent to substantiate the charges. 58 Cust.Ct. at 730.

In the present case, while the record is not clear as to whether plaintiffs checked the amounts listed as inland freight charges, there is no indication that plaintiffs suspected that such charges were excessive, and in fact plaintiffs felt that Sanyei did its business in an honorable manner.

The *Globemaster* case also contains factual elements which militate against finding a

---

delivers to his principal who reimburses the agent for all costs and expenses, the relationship between agent and principal is not a seller-buyer relationship. *Carmichael v. Lavengood,* 112 Ind.App. 144, 44 N.E.2d 177 (1942). See also *John I. Haas, Inc. v. Ellis,* 227 Or. 170, 361 P.2d 820 (1961).

12. To rebut this evidence defendant analyzed the Penney purchasing contracts and noted that some of these contracts did not specify any manufacturer and some were not signed by representatives of Penney. In particular, defendant cites eight specific transactions where the manufacturer was specified as Okano Hen-

shoku although the invoices showed that Sanyo Brush manufactured the articles. However, little weight can be given to this evidence which is based solely on the invoices, considering that two credible witnesses testified without contradiction that the identity of the manufacturers was always specified by the Penney buyers and changes could not be and were not made without the express authority of the plaintiffs. See *Davis Products, Inc., et al. v. United States,* 59 Cust.Ct. 226, 230–31, C.D. 3127 (1967). Also to be noted is the fact that these witnesses were not cross-examined by defendant as to these eight specific transactions.

principal-agent relationship. There the evidence demonstrated that the alleged buying agent bore the risk of any increase in price. 67 Cust.Ct. at 544, 337 F.Supp. 465. Here the evidence demonstrates the contrary. If a manufacturer was required to raise prices, plaintiffs were consulted and plaintiffs, not Sanyei, bore the risk. In *Globemaster* the importer never negotiated prices with manufacturers. 67 Cust.Ct. at 544, 337 F.Supp. 465. Here, it is clear that plaintiffs did negotiate price and other matters, such as quality and delivery, directly with manufacturers.

Lastly, defendant contends that Sanyei's services were identical with services performed by Purchasing's local market representatives. It is quite true that Purchasing's local market representatives performed services similar to those performed by Sanyei; however, such services were not performed with respect to the same shipments.

For the foregoing reasons, the court concludes that the amounts paid to Sanyei represented commissions paid to a bona fide buying agent and are, therefore, buying commissions which are not a proper element of dutiable value. Therefore, it is held that export value in the present case equals the appraised values less the charges for buying commissions. Judgment will be entered accordingly.